## Layman *v.* Doernte, Appellant.

Argued September 27, 1961. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

*Donald W. Bebenek,* with him *Meyer, Darragh, Buckler & Bebenek,* for appellant.

*Edgar P. Herrington, Jr.,* with him *Vincent R. Smith,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, December 5, 1961:

On June 17, 1957, Clement P. Layman, the plaintiff in this case, was seriously injured when the bus in which he was riding was struck in the rear by another bus. In the ensuing trespass action which he brought against the Doernte Bus Lines,* owner of both buses, the jury returned a verdict in favor of the plaintiff in the sum of $25,000. The defendant seeks a new trial on the sole asserted ground that the verdict is excessive and should not be allowed to stand.

When bus No. 1, in which the plaintiff was a passenger, was struck by bus No. 2, the plaintiff was thrown with great force against the back of the seat which he occupied, his head coming into violent contact with the handrail above the seat. This whiplash blow fractured the plaintiff's sixth and seventh vertebrae and, in consequence, he sustained disabilities and incurred ailments from which he had not recovered up to the time of the trial in October, 1960.

Immediately after the accident the plaintiff was treated by a chiropractor who later recommended him to Dr. Frank Pantalone, an orthopedic surgeon and physician. Dr. Pantalone, who examined Clement Lay-

---

* The original owner of the buses was Harry W. Doernte, trading and doing business as Doernte Bus Lines. He died and the defendant in this lawsuit became Mary Jane Doernte, Administratrix of the Estate of Harry W. Doernte.

man on July 20, 1957, testified: ". . . my first examination showed that he couldn't turn his neck well from one side to the other or forward or backwards. Whenever I pressed in back of his neck, he would have a lot of pain and tenderness. The muscles in the back of his neck would be as hard as rocks. There would be expansion and rigidity. He had spasms in the region of his neck . . . When I would press on his neck, it would shoot the pain through his neck and between the shoulder blades. He had weakness of both of his shoulder regions and his arms. The pain went all the way down to the bottom of his chest in the back."

The doctor found that the plaintiff had "two definite fractures or broken bones in two of the spinal processes." He recommended physiotherapy, a cervical collar, a cervical pillow, a brace for his back, muscle stimulation and home traction.

The plaintiff testified that he suffered from constant headaches. He described the symptoms: "You would swear your head was going to bust." He said further that his head "gets full of knots." When his wife was asked as to Layman's sleeping habits after the accident she replied: "Twisting and turning and groaning."

The doctor testified the plaintiff received physiotherapy 144 times; he saw him at his office about 175 times. Even after three years of medication and treatment, the plaintiff's prognosis was not a bright one: ". . . I am of the opinion after having examined him and followed him not once or twice but for three (3) years, I am convinced in my opinion he will never get completely better. He will maintain the disability that he now has for the rest of his life. The x-rays show instead of getting better as a result of the accident they have gotten worse. I am definitely convinced he will maintain the permanent partial disability that he now has."

The plaintiff's wife testified that her husband "seems to be getting what you call weaker." Also that "his condition is becoming progressively worse."

Dr. Pantalone said that the two fractures "have not hooked together": "the two pieces that are broken off the two vertebrae are still there in the muscles of the neck. If he doesn't get any better and tends to get worse, they will have to be removed because they are just like something there that doesn't belong there . . . He has a lot of muscle turned into gristle . . . No. 6 and No. 7 are split right in the middle . . . These can't heal because they are in the part of the neck where there is always motion going on no matter how much you try to stop it."

The doctor recommended an operation to "take out these two pieces" but he was not certain that the operation would accomplish a permanent cure because the plaintiff would still need physiotherapy.

The plaintiff's total out-of-pocket expenses up to the date of the trial amounted to some $2100. If the operation is performed the surgical bill will amount to $500, plus hospital bills, and then there will be the further expense for the therapy treatments.

The appellant's brief states: "Accepting these figures, it therefore seems that the jury awarded the plaintiff somewhere between $20,000 and $22,000 for his pain and suffering," and that this amount shocks "a sense of justice." The appellant's principal argument in support of the asserted excessiveness of the verdict rests on the fact that the plaintiff lost no time from his occupation because of his injuries.

It is true that the plaintiff did not remain away from his job the day after the accident and that he continued to be gainfully employed when work was available, but this, ipso facto, is not proof that he was not physically disabled. There are many reasons why a

person would continue at his employment and still be suffering from the effects of severe trauma.

The plaintiff, at the time of the accident, was 51 years of age. He is married and has four children, two of whom (a son 23 years of age and another 16) live with him at home. The 23-year old son is a permanent cripple, whose total helplessness is reflected in the fact that he must be spoon-fed. The younger son attends school. When the plaintiff was asked why he went to work after the accident he replied: "Because I couldn't keep the family going not working."

One who has been injured as the result of a tortious deed, and is legally entitled to recovery for his injuries, should not be penalized because he works in pain, and toils in agony, in order not to suffer the greater torment of seeing his family in want.

Moreover, continued employment after an accident, is no infallible criterion of physical strength, stamina or wholeness. Prior to the bus accident the plaintiff was employed as a "shot blaster" at the National Tube Company. The appellant describes this job as one entailing "the moving of large pipes, the rolling of them, the handling of a hose and distributing small steel pellets onto these pipes under heavy pressure. Following this, this shot must be shoveled up and these shovelfuls weigh approximately 75 pounds."

The appellant argues that since this type of job obviously requires physical strength and muscular power, the plaintiff could not possibly have been as seriously disabled as he testified. But the appellant ignores the all-important fact that the plaintiff did not return to his shot blasting job. His foreman, being aware of his injuries, put him to work "pushing a broom or working on kneeling couplings or odd jobs like that."

A benevolent employer may make allowances for a faithful employee and assign him to comparatively easy jobs so that the pay envelopes may, like an unbroken

assembly line, continue to carry the necessities of life to the employee's family. Thus, if Layman received the same rate of wages after the accident as before, this was due to the generous attitude of the employer, which benevolence does not lessen the responsibility of the tortfeasor. One who is responsible for an accident is required to make the victim of that accident whole to the extent that money can accomplish this, regardless of the intervening philanthropy of third persons.

Twenty thousand dollars is not an excessive sum for the pain, suffering and inconvenience which the plaintiff has endured and to which he will continue to be subjected as the result of his injuries. Because of those injuries he had to wear a cervical collar, one of those devices which gives to the wearer the rigidity and the possible appearance of a tribal chieftain wearing numerous iron necklaces. Aside from the pain and discomfort of such a contrivance, the wearer experiences the humiliating sensation of being in a pillory; he walks about in a mobile stock. There is the suggestion of a medieval felon.

Layman wore this apparatus, which he called a "dog collar", for a year—night and day, removing it only when he had to wash it because "The heat of your body would cause sweat, and it would run down the front of your shirt."

Even three years after the accident he still had to adopt the collar on occasion because, he said: "When you don't have the support, you sit down and your head just seems to want to fall down."

The plaintiff must also continue to use the "home traction," a device of pulleys, ropes, weights and chin cup described by the doctor as a contrivance which "goes and stops, goes and stops." The plaintiff is required to wear his brace every day; at night he must use the "cervical pillow", and he sleeps with a board beneath his mattress. When the weather changes, he experiences excruciating pains in the head and neck.

The phrase "pain and suffering" has become a commonplace in the law and often is employed in a casual manner to suggest the temporary discomfort which accompanies a temporary disability. In this case, however, the phrase takes on a meaning of true and literal significance. The plaintiff's pain is intense and constant, and his suffering is penetrating and severe. This type of hurt creates a disability of its own, which loses none of its compensatory scope because the sufferer, for reasons already stated, continues to be gainfully employed at the same wage paid him prior to his disablement.

The static nature of one's stipend may in this day of constantly increasing wages be evidence in itself of remunerational impairment.

Within the phrase "pain and suffering" falls also the loss sustained by the head of a household who, because of his physical incapacity, is unable to perform domestic tasks which theretofore contributed substantially to the well-being of the household. Prior to June, 1957, Layman habitually worked at his garden (¾ths of an acre), the yield of which helped in the domestic economy, he did the repair work around the house, he assisted in the cleaning processes and generally performed all those jobs, whose completion go to make up a well-organized happy home. This type of activity has its monetary equivalent and the inability to perform it comes within the ambit of pain and suffering.

Layman helped his wife to take care of their crippled child. Mrs. Layman testified: "Like I said before, he always tried to help me with this boy of ours. We have to do everything for him, even feed him. He can't hold a spoon. I have to feed him by mouth. He [husband] can't help to do that anymore."

It is obvious that the inability to assist one's own helpless child is a grievous pain in itself.

The appellant has cited various cases in which asserted high verdicts were reduced by this Court and the Superior Court. The mere height of a verdict, however, is in itself no evidence of excessiveness because height is always a matter of relativity. Even the Empire State Building in New York is but a toadstool when placed against the image of Mt. Everest. Thus, the $25,000 verdict in this case must be placed against the mountain peaks of inflation, as well as the hills of the years the plaintiff must climb before he reaches the climacteric of life. A verdict of $25,000 of today is certainly not equivalent to a verdict of that sum twenty years ago, much less is it like a similar verdict of thirty and forty years ago. (*Spangler v. Helm's New York-Pittsburgh Motor Express*, 396 Pa. 482.)

Nostalgic and sweet as may be the memory of the American dollar of 1940, 1930, and 1920, the inexorable fact remains that *that* dollar has gone forever. It would require a search of sea-diving or archaeological intensity to find an article whose price has not doubled, tripled, or quadrupled during the last two or three decades. Hence, a comparison with verdicts of the past can only be meaningful if we assume in unrestrained fantasy that we can still purchase a five-cent ice cream cone, a five-cent hamburger, a five-cent shoe shine, a good five-cent cigar, a 35-cent haircut, a 15-cent shave, beef steak at 15 cents a pound, a good theatre seat for 50 cents, a seven-course dinner for a dollar, a pair of shoes for two dollars, and a 12-ounce glass of beer for a buffalo nickel, both buffalo and nickel having now, for practical purposes, almost disappeared.

Moreover, the facts in the cases cited by the appellant are wholly dissimilar to the ones in the case at bar. In addition it must be kept in mind that the plaintiff faces the prospect of an operation which will include hospitalization and forced abandonment of gainful employment during the period of surgery and convales-

cence, and then there are always the therapy treatments which the doctor has prescribed for the rest of the plaintiff's life.

In view of all these circumstances, the verdict of $25,000, instead of shocking the conscience of the court, convinces the Court that it is fair and reasonable and should be sustained.

The judgment is accordingly affirmed.