664 A.2d 102

John DOE and Jane Doe, H/W, Appellants,

v.

David M. RAEZER, M.D., Stanley H. Shrom,
M.D. and Usurg Associates, Inc.

John DOE and Jane Doe, H/W,

v.

David M. RAEZER, M.D., Stanley H. Shrom, M.D.
and Usurg Associates, Inc., Appellants.

Superior Court of Pennsylvania.

Argued March 9, 1995.

Filed July 18, 1995.

Reargument Denied Sept. 27, 1995.

336

James E. Beasley, Philadelphia, for John and Jane Doe.

James C. Stroud, Philadelphia, for Raezer, Shrom and Usurg Associates.

Before DEL SOLE, FORD ELLIOTT and CERCONE, JJ.

CERCONE, Judge:

This case presents an appeal and cross-appeal from the order of the trial court which granted defendants' motion for remittitur or, in the alternative, a new trial. We reverse.

The facts, in short, are as follows: John Doe, a diabetic, experienced difficulty in completely emptying his bladder. In July 1987, Mr. Doe consulted David M. Raezer, M.D., a urologist and shareholder in the professional corporation Usurg Associates, Inc. Dr. Raezer diagnosed Mr. Doe as suffering from severe phimosis, involving a contraction of the foreskin of the penis, and balanitis, an inflammation of the glans penis causing a leaking of urine from that organ. On July 21, 1987, Dr. Raezer performed a circumcision on Mr. Doe to alleviate the problem.

Before surgery, Mr. Doe claims that his erect penis measured six and one-half inches. Mr. Doe testified that after the first procedure, he measured only two and one-half inches. Additionally, the build up of urine at night resulted in external tearing and bleeding of the surgical wound. Several weeks after surgery, Mr. Doe was permitted to try sexual intercourse. Mr. Doe discovered that he could not engage in intercourse without tearing and bleeding, and could not ejaculate. Mr. Doe informed Dr. Raezer of these problems.

Observing that Mr. Doe had developed a post-circumcision chordee restriction, Dr. Raezer recommended a second proce-

dure. Approximately two weeks after the second procedure, Mr. Doe developed an infection which caused the tearing wound to burst open. Dr. Raezer prescribed no antibiotics, but recommended four epsom salt baths per day. The wound did not heal and continued to tear and bleed. This pain and bleeding persisted for one year after the second procedure.

By performing this second procedure, known as a penoplasty, Dr. Raezer sought to release the chordee restriction. However, Mr. Doe discovered during surgery, skin from his testicle was attached to the head of his penis resulting in hair on the shaft. Although he can complete the act of intercourse, Mr. Doe achieves only minimal penetration and his sexual relationship with his wife is "quite hampered and diminished." N.T. 8/30/93 at 91. Mr. Doe further testified that he felt he could not "perform" for his wife and was frustrated with the whole situation. *Id.* at 93.

By means of this lawsuit against David M. Raezer, M.D., Stanley H. Shrom, M.D. and Usurg Associates, Inc. (defendants), Mr. Doe sought damages for pain and suffering and Mrs. Doe petitioned for damages for loss of consortium. The jury found defendants Raezer and Usurg Associates liable and awarded one million, five hundred thousand dollars ($1,500,-000) to Mr. Doe, and seven hundred fifty thousand dollars ($750,000) to Mrs. Doe for loss of consortium. Defendants filed post-trial motions requesting a new trial, judgment n.o.v., or remittitur.

The matter was re-assigned to a different judge for determination of the post-trial motions. The post-trial motions judge granted defendants' motion for remittitur for that portion of John Doe's claim in excess of five hundred thousand dollars ($500,000), and for that portion of Jane Doe's claim in excess of two hundred fifty thousand dollars ($250,000). In the alternative, the post-trial motions judge offered plaintiffs a new trial based upon the excessiveness of the verdict. Plaintiffs filed an appeal from the order of the post-trial court granting remittitur or a new trial. Defendants cross-appealed challenging the post-trial motions court's denial of a new trial or judgment n.o.v.

In their appeal from the grant of remittitur or in the alternative, a new trial, plaintiffs raise the following issue for our review:

> [Did the post-trial motions judge] err in substituting his judgment for that of the jury and the trial judge, dismissing the jury's considered verdict as worthless, and ruling, on a "cold" reading of the transcript, that the verdict was excessive and that the plaintiff-husband should consent to a remittitur above the sum of $500,000.00 and the plaintiff-wife to a remittitur above the sum of $250,000.00, or suffer a new trial.

Defendants cross-appeal and raise the following question for our review:

> Whether the trial court's denial of the Motion for New Trial of defendant urological providers was error when: trial evidence demonstrated that plaintiffs' expert testimony was so vague, conclusory and speculative as to be insufficient to sustain plaintiffs' burden of presenting a *prima facie* case of negligence in the performance of circumcision and v-y plasty procedures; evidence demonstrated that husband-plaintiff gave his informed consent to surgery; the trial court improperly admitted expert evidence that the husband-plaintiff had a permanent penile condition; the trial court improperly allowed plaintiffs to cross-examine defendants' medical expert on the issue of whether husband-plaintiff gave his informed consent; the trial court erred in admitting a photograph of husband-plaintiffs' penis, which, in isolation, had no evidentiary value for the issues at bar and was more prejudicial than probative; the trial court allowed inadmissible hearsay evidence about husband-plaintiff's prescriptions; the trial court improperly gave the jury an "increased risk of harm; instruction on causation?

We shall first address the issue raised by plaintiffs.

The plaintiffs in the instant case challenge the propriety of the post-trial motions court's grant of remittitur or, in the alternative, a new trial. In this regard, plaintiffs contend the post-trial motions judge improperly substituted his judgment

for that of the jury in ordering remittitur of the jury's verdict or, in the alternative, a new trial. We agree.

■ Normally, the determination of the amount of damages that a person is to be awarded for pain and suffering, both past and future, is primarily a jury question. *Stoughton v. Kinzey*, 299 Pa.Super. 499, 502, 445 A.2d 1240, 1242 (1982). Judicial reduction of a jury award for compensatory damages is appropriate only when the award is plainly excessive and exorbitant in a particular case. *Haines v. Raven Arms*, 536 Pa. 452, 455, 640 A.2d 367, 369 (1994), *supplemented by* 539 Pa. 401, 652 A.2d 1280 (1995). The trial court may grant a request for remittitur only when a verdict that is supported by the evidence suggests that the jury was guided by partiality, prejudice, mistake or corruption. *Krysmalski by Krysmalski v. Tarasovich*, 424 Pa.Super. 121, 147, 622 A.2d 298, 312 (*en banc*), *appeal denied*, 535 Pa. 675, 636 A.2d 634 (1993).[1]

■ "A remittitur should fix the highest amount any jury could properly award, giving due weight to all the evidence offered." *Cashdollar v. Mercy Hospital of Pittsburgh*, 406 Pa.Super. 606, 618, 595 A.2d 70, 76 (1991). Therefore, the correct question on review is whether the award of damages "falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." *Haines v. Raven Arms*, *supra* (citing *Carminati v. Philadelphia Transportation Co.*,

---

1. With all due respect to the post-trial motions judge, whose competence we hold in highest esteem, it is nevertheless unfortunate that he did not oversee the trial but only reviewed the cold record during post-trial motions. We do note, however, that the trial judge wrote a letter to the post-trial motions judge in which he expressed his personal view regarding the excessiveness of the jury's verdict:

> Given my status as being merely a Judge Pro Tempore, I doubt that I have the authority to file a dissenting opinion. However, while I agree with all of your rulings on Post-trial Motions in the case, I cannot agree that the verdicts were "excessive" in the legal sense. While the verdicts are very substantial, I believe that they are within the permissive parameters of a jury verdict, especially given the quality of the testimony given both by the individual Defendant and the Defendant's expert under cross-examination.

Letter of Thomas B. Rutter, J.P.T., dated September 6, 1993.

405 Pa. 500, 509, 176 A.2d 440, 445 (1962)). On appeal, the Superior Court is not free to substitute its judgment for that of the fact finder. *Botek v. Mine Safety Appliance Corp.*, 531 Pa. 160, 166, 611 A.2d 1174, 1176 (1992). Rather, it is our task to determine whether the post-trial motions judge committed a "clear" or "gross" abuse of discretion when conducting its initial evaluation of a defendant's request for remittitur. *Id.* at 165, 611 A.2d at 1176.

 Similarly, a new trial may be granted on the grounds that the verdict is excessive and against the weight of the evidence only when the verdict "shocks the court's sense of justice and makes a new trial imperative so that right may be given another opportunity to prevail." *Freeman v. Maple Point*, 393 Pa.Super. 427, 436, 574 A.2d 684, 689 (1990). Generally, the duty of assessing damages is within the province of the jury. *Little v. York County Earned Income Tax Bureau*, 333 Pa.Super. 8, 23, 481 A.2d 1194, 1202 (1984). The grant of a new trial on the ground of excessiveness is peculiarly within the discretion of the *trial court* and this court will not disturb such an order unless the record discloses a clear abuse of discretion. *Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 378, 275 A.2d 296, 299 (1971); *Christides v. Little*, 274 Pa.Super. 343, 347, 418 A.2d 438, 440 (1980).

> However, this does not mean we will not interfere or reverse such an order in a case where the trial court attempts to substitute its judgment for that of the jury as to what damages should be recovered. The duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence.

*Id.* at 378, 275 A.2d at 299.

 There are several factors which are relevant in determining whether a verdict is excessive:

> (1) the severity of the injury, (2) whether plaintiff's injury is manifested by objective physical evidence instead of merely the subjective testimony of the plaintiff, (3) whether the

injury will affect the plaintiff permanently, (4) whether the plaintiff can continue with employment, (5) the size of the plaintiff's out-of-pocket expenses, and (6) the amount plaintiff demanded in the original complaint.

*Christides v. Little*, 274 Pa.Super. at 348, 418 A.2d at 440. In determining that a verdict is "excessive," a trial court is required to set forth the reasons for its conclusion. *Haines v. Raven Arms*, 536 Pa. at 456, 640 A.2d at 369, and *supplemental opinion* at 402 – 404, 652 A.2d at 1281–82. Moreover, if a trial court indicates that the reasons it gives for granting a new trial are the only basis for that decision, this court can only examine those reasons. *McDermott v. Biddle*, 436 Pa.Super. 94, 112–13, 647 A.2d 514, 523 (1994).

■ Here, the post-trial motions judge, upon a cold reading of the record, determined that the damage awards to Mr. and Mrs. Doe did not bear "a reasonable relation to the injuries" and were "excessive." *Id.* at 5. In its opinion, the lower court cited the following reasons for its finding of excessiveness: (1) the fact that the Does have "resumed regular sexual relations, albeit somewhat reduced in pleasure"; [2] (2) the fact that Mr. Doe can have intercourse without pain or bleeding; [3] (3) consideration of "all of the circumstances in this case and jury verdicts in this jurisdiction for other, more serious and more permanent injuries"; [4] and (4) the possibility that the jury may have confused the Does' testimony regarding Mr. Doe's pain and suffering following surgery for the condition as it now exists.[5] We have reviewed each of these reasons cited by the post-trial motions judge. After reviewing the record, however, we cannot escape the conclusion that the post-trial motions court reevaluated the evidence presented at trial and improperly substituted its judgment for that of the jury in determining that the verdicts were "excessive."

2. Trial Court Opinion at 2.

3. *Id.* at 4.

4. *Id.* at 4.

5. *Id.* at 9.

The post-trial motions court found that the Does had "resumed regular sexual relations, albeit somewhat reduced in pleasure." Trial Court Opinion at page 2. Related to this determination, the aforesaid noted that Mr. Doe could have intercourse without pain or bleeding. Our review of the record, however, discloses problems much more serious than a sex life "somewhat reduced in pleasure."

At trial, Mr. Doe testified that prior to the surgeries, he and his wife maintained a "very content," and "very sharing" life. N.T. 8/30/93 at 94. When asked whether the sharing was also sexual, Mr. Doe responded: "In every manner. In every way." *Id.* Mr. Doe explained the effect of his injury as follows:

> Emotionally, I am embarrassed that I can't perform for my wife; I can't express—it's one of the ways of expressing your love. The closeness that culminates with the sexual act, it's just not there any more.
>
> It's a strain and it's a problem. It makes me more angry than—I don't know what else to say. I am frustrated with the whole situation.

N.T. 8/30/93 at 93. When asked how Mr. Doe's quality of sex at the time of trial compared to what he and his wife enjoyed prior to surgery, Mr. Doe responded: "Nothing, nowhere, not even close to what we enjoyed prior to the surgery." *Id.* at 174.

Mrs. Doe further elaborated on the impact of Mr. Doe's injury to their sexual relationship:

> Q. [Plaintiffs' Counsel]: Now, after the November 11th surgery—
>
> A. [Mrs. Doe]: Yeah.
>
> Q. —was there any significant difference as compared to that period after the first surgery?
>
> A. It was very minimal. There was just one—one position where he could—there was just one position where we could even try to have sex. It was hard. There was hardly anything there to penetrate, and he would bleed. He would get an erection, it would bleed and it was just terrible.

344

Q. Before the July 21st, 1987, surgery were you and your husband capable of having sex in more than one position?

A. Oh, of course.

Q. Were you restricted to any one position?

A. No.

Q. Could you have it in any position that you felt like at the moment?

A. Yes.

Q. Now, you've just told the folks on the jury that after the second surgery there was only one position—

A. That's right.

Q. —that you can have sex?

A. Yes, that's right.

Q. Would you mind telling us what that is?

A. It's on the edge of the bed. I can't describe.

Q. When you say "the edge of the bed", was it any particular portion of the bed?

A. Yeah, the corner of the bed. He just—

Q. And was there any penetration?

A. Very minimal. He can't—because there's just—

Q. How does that make you feel?

A. I feel very frustrated. I feel very sorry for him, because I know it hurts him.

Q. Have you said anything to him about that?

A. About not—about what, not being satisfied?

Q. Yes.

A. I don't have to, we've been married for 35 years and I wouldn't say that to him any way. He knows.

\* \* \* \* \* \*

[Mrs. Doe]: It's not—it's not very satisfactory. Our sex left [sic] isn't satisfactory at all. What penis he has has all hair around it. I don't know what else to tell you.

Q. With respect to you, [Mrs. Doe], whatever the anticipation, the lovemaking that occurred before July 21st, 1987,

the spontaneity of that, has that type of lovemaking been affected in any way?

A. Of course. Of course. How—how—how can—

Q. Let me ask you this: Do you look forward to the sex act with your husband and lovemaking when you know what the end result is going to be?

A. No, I don't. It's very frustrating. And I feel very sorry for my husband because I see how it frustrates him.

N.T. 8/31/93 at 7–8, 9–10. Additionally, Mrs. Doe testified that after surgery, but prior to menopause, the act of putting on a condom presented its own difficulties. She testified that Mr. Doe "couldn't put a condom on. The condom wouldn't stay on. That was part of the problem, too." *Id.* at 13. When questioned further, Mrs. Doe explained that "there was nothing [for the condom] to stay on to." *Id.* Based upon the Does' testimony, we find the lower court's statement that the Doe's sex life was "somewhat reduced in pleasure" to be a gross understatement of the evidence presented at trial.

The post-trial motions court also stated that it considered "all of the circumstances in this case and jury verdicts in this jurisdiction for other, more serious and more permanent injuries" in determining that the verdict was excessive. The lower court did not specifically cite which cases it reviewed in making this determination, nor did our independent research disclose cases involving similar injuries. However, the lower court provided additional insight in its denial of judgment n.o.v.: "[I]t is possible that the excessive verdict is because the jury thought that the pain which [Mr. Doe] and counsel described in vivid detail remained as a permanent condition." *Id.* at 9. Once again, we are unable to find support in the record for this conclusion.

During cross-examination, Mr. Doe testified that he was able to achieve ejaculation "after '89. After '89, **when the burning and bleeding stopped,** and then the penetration was very limited." N.T. 8/30/93 at 164 (emphasis added). Mrs. Doe also testified:

Q. [Plaintiffs' Counsel]: Do you remember, looking back now over those unfortunate years, how long this bleeding when he would obtain an erection lasted? Over what period of time?

A. [Mrs. Doe]: It was well over a year, maybe two years that that would happen.

Q. And is there any bleeding today?

A. No.

N.T. 8/31/93 at 8–9. After reviewing the transcripts of the trial, we must conclude that the post-trial motions judge's remarks were unfounded, but furthermore and most important, the jury was fully cognizant of the situation when it brought in its verdict.

The post-trial motions court's rationale for its finding of excessiveness is perhaps best explained by the following passage from its opinion dated August 31, 1994:

It is difficult for a jury to objectively evaluate pain and suffering in any case, and particularly difficult in cases involving sexual injuries. They have little or no experience in translating pain and embarrassment into dollars, and are given little guidance by the Court's charge. Therefore, it is appropriate for the Court to intercede when it is determined that the verdict is unreasonable and was influenced by sympathy or mistake.

Therefore, I have determined that this verdict is "shocking to my sense of justice" or is "shocking to the conscience." What does it mean, shocking to the conscience? To look at it one way, **if I was a juror, I could not vote for such a high verdict and be true to my conscience. Therefore, In this case since the verdict so exceeds my experience and anticipating, my surprise is the kind of "shocking" that is equivalent to "shocking the conscience."**

Post-trial Motions Court Opinion dated 8/31/94 at page 3 (emphasis added). This is an unfortunate narration of a strong personal opinion by the post-trial motions judge who did not oversee the trial, and whose opinion is not supported

by the record. Because the record does not support the post-trial motions court's stated reasons for granting remittitur or a new trial, we can only conclude that the post-trial motions court improperly substituted its own judgment for that of the jury. *See Layman v. Doernte*, 405 Pa. 355, 363, 175 A.2d 530, 534 (1961) (the large size of a verdict is in itself no evidence of excessiveness).

The jury, limited only by the prior stated exceptions, is the ultimate fact-finder and brings to its verdict its most valued asset and that is its composite experience regarding the problems involving the human travail as it applies to life in the community. This includes its understanding of the physical, mental and emotional disabilities that can adversely affect an otherwise normal relationship between husband and wife. The jury understands that a person's whole physical, mental and emotional characteristics are constantly in delicate balance with each other. Injury to one by a directly related cause can bring about an imbalance in the other two characteristics.

In this case, Mr. Doe's physical ability to enjoy sexual relations with his wife was an integral part of his physical and emotional welfare and his general health. The surgical procedures' negative impact on this balance had an incalculable effect on the normal balance of these essential characteristics. It is this concomitant imbalance that imposed a dreadful and traumatic impact on the life of the family of Mr. and Mrs. Doe. Upon a careful review of the record, we find no evidence that the jury's verdict was the result of partiality, prejudice, mistake or corruption, nor that it was so excessive as to shock this court's sense of justice. The verdict was a clear mandate of the jury's findings of a serious physical, mental and emotional injury inflicted upon Mr. and Mrs. Doe and thus represent an eminently fair result. Accordingly, we vacate that portion of the post-trial motion' court's order which granted remittitur or, in the alternative, a new trial and reinstate the jury's verdict.

In their Counterstatement of the Questions involved, defendants argue that the trial court improperly refused to grant a

new trial because: (a) The jury's finding of a lack of informed consent is against the weight of the evidence; (b) plaintiffs' expert testimony, which was without adequate basis in fact, is legally insufficient to establish a *prima facie* case of negligence in the performance of the circumcision and the v-y plasty procedures; (c) trial court improperly permitted plaintiffs to cross-examine defendant's expert on the issue of whether Mr. Doe gave his informed consent to the procedure; (d) the trial court improperly admitted expert evidence that the plaintiff had a permanent penile condition; (e) the trial court improperly admitted a photograph of Mr. Doe's penis; (f) the trial court improperly admitted hearsay evidence about Mr. Doe's prescriptions; and (g) The trial court improperly issued a jury instruction regarding the "increased risk of harm."

We have reviewed the parties' briefs and the record certified to this court on appeal. The post-trial motions court correctly resolved issues (c), (d), (f) and (g) and found them to be without merit. We affirm on the basis of the post-trial motions court's opinion dated August 31, 1994 with regard to each of these issues.

■ In Issue (a), defendants challenge the weight of the evidence supporting a finding of lack of informed consent. In this regard, defendants support their argument by pointing out that Dr. Raezer explained the risks of the procedure, and that Mr. Doe read and signed the consent form. In reviewing a claim that the verdict is against the weight of the evidence, it is well-settled that a new trial will be awarded only where the verdict is so contrary as to shock one's sense of justice. *Commonwealth v. Thompson*, 538 Pa. 297, 315–16, 648 A.2d 315, 324 (1994); *Giovanetti v. Johns–Manville Corp.*, 372 Pa.Super. 431, 439–41, 539 A.2d 871, 875 (1988).

■ At trial, Mr. Doe testified that prior to the first procedure, Dr. Raezer never informed him that the removal of too much foreskin could cause the organ to be shortened. N.T. 8/30/93 at 68. Mr. Doe admitted signing consent forms, but testified that Dr. Raezer failed to explain the risk related

to the removal of the foreskin. *Id.* at 80.[6] The fact that Mr. Doe's penis was drastically reduced resulting in an abnormal physical condition is dramatic evidence of the serious risks involved with the procedure. There is no evidence that Mr. Doe would have agreed to the procedure had he known of these risks. Although Dr. Raezer contradicted Mr. Doe's testimony at trial, we cannot state that the verdict is so against the weight of the evidence as to shock our collective conscience. Accordingly, we cannot grant defendants relief on this basis. *See Baldino v. Castagna,* 505 Pa. 239, 478 A.2d 807, 812 (1984) (new trial should not be granted on a mere conflict in testimony).

■ Defendants next argue that the evidence is insufficient to sustain the jury's verdict on the theory of negligence and therefore, request the grant of a new trial. However, a review of the certified record discloses that defendants' post-trial motions do not include a request for a new trial on this basis. Defendants instead requested judgment notwithstanding the verdict based upon the legal insufficiency of the testimony by plaintiffs' expert. In their appellate brief, defendants reframe their argument as a request for a new trial. Because defendants never preserved a claim for a new trial on this basis before the lower court, it is waived. Pa.R.A.P., Rule 302(a), 42 Pa.C.S.A.

We have reviewed this record and find no error by the post-trial motions court in denying defendants' motion for judgment n.o.v. The post-trial motions court correctly concluded that (1) the expert testimony provided by Dr. Varano was sufficient to support a finding of negligence in performing the circumcision; and (2) the testimony was sufficient to support a finding of negligence in failing to administer antibiotics which exacerbated the post-operative infection thereby causing further bleeding and pain at the operative site. As we stated earlier, the fact that the size of the penis was so drastically reduced and the resulting abnormal physical appearance dra-

6. Additionally, we note that Mr. Doe further testified that prior to the second procedure, Dr. Raezer did not inform him that after surgery, he might find hair on the shaft of the penis. *Id.* at 86.

matically evidences Dr. Raezer's negligence in the performance of the circumcision. If defendants had challenged the post-trial motions court's failure to grant a judgment n.o.v., we would affirm on the basis of the post-trial motions court's opinion dated August 31, 1994 with regard to this issue.

In Issue (5), defendants argue that the trial court improperly admitted a photograph of the infected surgical wound at trial. We have carefully reviewed the contents of the certified record and are unable to find the photograph in question. It is well-settled that the Superior Court may only consider documents properly incorporated within the certified record. *Gemini Equipment v. Pennsy Supply*, 407 Pa.Super. 404, 412 n. 5, 595 A.2d 1211, 1215 n. 5 (1991). The certified record consists of the original papers and exhibits filed in the lower court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court. *See* Pa.R.A.P., Rule 1921, 42 Pa.C.S.A. (Composition of record on appeal); *Frank v. Frank*, 402 Pa.Super. 458, 463 n. 5, 587 A.2d 340, 342–43 n. 5 (1991). "It is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Fiore v. Oakwood Plaza Shopping Center, Inc.*, 401 Pa.Super. 446, 460–61, 585 A.2d 1012, 1019 (1991).

In the interests of justice, however, this court contacted the trial court in an attempt to locate the wayward picture. Unfortunately, the trial court is also unable to locate the picture. "For purposes of appellate review, what is not of record does not exist." *Frank v. Frank, supra*, 458, 587 A.2d 340. Because defendants did not include the contested photograph in the certified record, we are unable to address the merits of their contention.

The lower court's order granting remittitur or a new trial is reversed. Case is remanded for entry of judgment on the jury's verdict. Jurisdiction is relinquished.