# Tolbert v. Bowers

C.P. of Bucks County, no. 96-005325-17-2.

*Joseph J. DiGiovanni,* for plaintiffs.
*Michael Senoyuit,* for defendant Pa. Financial Responsibility Assigned Claims Plan.
*John P. Gonzales,* for defendants.

CLARK, *S.J.,* September 7, 2000—Plaintiffs, passengers in a motor vehicle, were severely injured in an accident with a stolen van being operated by a 14-year-old runaway from a mental facility in Bucks County, Pennsylvania, which van was being pursued by Doylestown Township officers. At the conclusion of a five-day trial commencing January 31, 2000, the jury awarded both plaintiffs substantial verdicts. Post-trial motions were timely filed by defendants setting forth numerous reasons why they should be awarded judgment notwithstanding the verdicts, a new trial or a remittitur of damages.

At oral argument conducted on August 15, 2000, defendants emphasized two areas where they argued the trial judge erred in ruling against them on evidentiary matters. They also argued for judgment n.o.v.

The first evidentiary ruling concerned the defense attempt to bring before the jury the possession of certain narcotics found in the plaintiffs' vehicle after the accident. And, also, the results of certain blood analyses of plaintiff Dorsey Williams and one Eric Wilburn, the driver of the car he occupied.

The defense made an offer of proof that a toxicologist could interpret the results of the blood tests on the driver, Eric Wilburn, and give an opinion that the amount of cocaine in Wilburn's system at the time of the accident substantially impaired his ability to operate a motor vehicle.

The defense also argued at trial that the amount of cocaine in plaintiff Dorsey Williams' system established that he was somehow contributorily negligent.

The court ruled prior to trial, and at trial in favor of plaintiffs' motion in limine to preclude the defense from presenting any evidence or testimony relative to the laboratory analysis of Eric Wilburn's blood extracted after the accident. In so ruling, the court concluded that there was no independent corroborative evidence that Wilburn was improperly operating his vehicle in any manner prior to the accident and, therefore, the results of the toxicology report were inadmissible. The court concluded that since the results of the report had no probative value, the introduction to the jury could only be unfairly prejudicial.

The court likewise ruled prior to trial and at trial in favor of plaintiffs' motion in limine to preclude the defense from presenting any evidence or testimony relative to the laboratory analysis of Dorsey Williams' blood extracted after the accident. In so ruling, the court concluded that there was no independent corroborative evidence that Williams in any way contributed to the happening of the accident and, therefore, the introduction to the jury could only be unfairly prejudicial.

At trial, plaintiffs produced one Frederick Magargal, a 47-year-old tractor-trailer driver with some 30 years

driving experience as an eyewitness to the accident. He testified that on a clear day at about 3 p.m. he slowed and stopped at the intersection of Folly Road and County Line Road, after observing a van coming south on Folly Road, "going at a high speed . . . ." (N.T., 2/1/2000, p. 12.)

He further testified that he could tell that "the van wasn't going to be able to stop for the stop sign, and that the vehicle (Wilburn) travelling eastbound on County Line Road was probably going to be in trouble." His testimony went on as follows:

"Q. When the van got to the intersection of County Line and Folly Road, what did it do?

"A. Ran the stop sign.

"Q. Did it make a right or left turn?

"A. Made a right.

"Q. And that would have been westbound, the same direction as you were going?

"A. Yes.

"Q. Can you describe how it made that right turn?

"A. A wide right turn out into the eastbound lanes.

"Q. That's the lane that you saw the car coming eastbound?

"A. Correct.

"Q. Can you describe what happened to that car?

"A. He was forced off the roadway.

"Q. Did you actually see that happen?

"A. Yes . . . .

"A. Shortly after leaving the travel portion of the road, it slammed into a telephone pole, and then went sideways and slide [sic] eastbound on County Line Road." (N.T., 2/1/2000, pp. 14-15.)

In addition,

"Q. Did you ever see that vehicle traveling eastbound ever cross into the westbound lane?

"A. No.

"Q. He was always within his lane?

"A. Yes.

"Q. Until he was run off the road?

"A. Correct." (N.T., 2/1/2000, p. 20.)

Still later on cross:

"Q. Regarding the vehicle in which plaintiffs were occupying, was that—can you describe the operation of that vehicle? Was that travelling in a safe manner?

"A. As I saw it, yes . . . .

"Q. Based on your observation, was that vehicle traveling in a safe manner?

"A. Yes." (N.T., 2/1/2000, p. 28.)

Next at trial, the investigating police officer, Connie Johnson from Horsham Township Police Department, testified, without objection, that on page 3 of her report, she stated, "The operator of unit 1 (Wilburn) took the only evasive action possible to avoid hitting the van head-on." (N.T., 2/1/2000, p. 67.)

Earlier, she had testified, without objection, that she took a statement from Eric Wilburn as follows:

"Operator of unit no. 1 (Wilburn) stated he was travelling east on County Line Road and then this van came out fast and made a wide right turn into his lane.

"He said he tried to steer away from the van and then he hit the telephone pole." (N.T., 2/1/2000, pp. 38-39.)

The above is the only testimony presented at the trial on the manner in which Wilburn was operating his vehicle prior to impact. There was absolutely no evidence

presented that Wilburn was operating his vehicle other than in a safe manner.

Eric Wilburn is not a party in this case. Therefore, the manner in which he was driving can only be relevant as it may impact on Bower's negligent driving. However, the only evidence presented in this case bearing on Wilburn's driving was that he was safely operating his vehicle in his own lane of travel when he swerved to avoid a head-on collision in his own lane with the Bower's vehicle. And the evidence further discloses Bowers was speeding, out of control, had run a stop sign and proceeded into Wilburn's lane of travel.

In the absence of some evidence that Wilburn was driving negligently, carelessly or recklessly, the fact that he had cocaine in his blood extracted after the accident, has no probative value. See *Clinton v. Giles,* 719 A.2d 314, 318 (Pa. Super. 1998).

Even if by some stretch of reasoning, the cocaine content in Wilburn's blood is deemed to be a relevant factor in this case, it is so clearly prejudicial as to have been properly excluded in the exercise of this trial court's discretion. See section 403 of the Pennsylvania Rules of Evidence which provides inter alia: "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

Speaking of "stretches," it is even more difficult to understand the defense's argument that the presence of cocaine in plaintiff Dorsey Williams' system is tantamount to comparative or contributory negligence. Williams was a passenger. All the evidence clearly indicates Wilburn was driving safely. How could Williams have

been possibly contributorily negligent in this case? Again, the trial court properly excluded the defense proffer in this regard. See *Pascal v. Carter*, 436 Pa. Super. 40, 647 A.2d 231 (1994).

In *City of Pittsburgh v. Jodzis*, 147 Pa. Commw. 234, 243, 607 A.2d 339, 344 (1992), the court stated:

"In Pennsylvania a trial court may properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury; 'prejudice' for the purposes of this rule does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis. *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa. Super. 14, 22, 473 A.2d 584, 588 (1984). The trial court has broad discretion regarding the admission of potentially misleading and confusing evidence. *Id.* In the present case, the trial court concluded that the city's attempt to introduce the evidence of contraband [drugs] was designed to present scandalous information that was otherwise inadmissible, and logically unrelated to any legitimate determination of causation, and which would inflame the social conscience or biases of the jury and suggest a decision on an improper basis. Again, we agree that any probative value of this evidence was slight in comparison with the potential for prejudice; therefore, we find the trial court's exclusion to be a proper exercise of discretion. . . ."

The defense's second major argument on evidentiary rulings presented at oral argument before this court on August 15, 2000, was that the court erred in not permitting Chief White to give his opinion evidence to the jury,

which opinion he arrived at after reviewing Officers Mettin's and Getter's post-accident reports.

To begin with, Chief White was never listed as an expert witness and no expert report was ever submitted to plaintiffs prior to or during trial. The chief could testify as to his knowledge of what was going on during the pursuit of two of his officers. However, the record reveals that at best, in the beginning of the pursuit, Chief White was on foot looking for the 14-year-old runaway. Later, he was receiving very sketchy information over the police radio concerning the pursuit. After the fact, he reviewed the self-serving post-accident reports of the two pursuing officers.

The court did permit Chief White to testify concerning his authorship in 1990 of the Doylestown Township police pursuit policy.

The township also produced a retired captain from nearby Bensalem Township Police Department, who had been identified as an expert witness and whose expert witness report had been provided to plaintiffs prior to trial. He therefore gave opinion testimony similar to the defense proffer as to Chief White.

The trial court properly raised the defense attempt to have Chief White give expert opinion testimony in this case. This same reasoning applies to the court's refusal to allow Lieutenant Dunlap and Sergeant Sutton to testify as expert witnesses in this case. (N.T., 2/3/2000, pp. 85, 88, 91, 92, 93, 94, 95, 97, 100, 101, 102, 107.)

The defense's next major argument concerns their motion for judgment n.o.v.

The issue in this case is whether Officers Mettin (radio) and Getter (driver) were negligent in this police

pursuit chase, and whether that negligence was a substantial factor in bringing about the harm to the plaintiffs. The Motor Vehicle Code in section 3105 addresses such pursuits by police officers and provides in pertinent part:

"(a) General rule.—The driver of an emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm may exercise the privileges set forth in this section, but subject to the conditions stated in this section.

"(b) Exercise of special privileges.—The driver of an emergency vehicle may: . . .

"(2) Proceed past a red signal indication or stop sign, but only after slowing down as may be necessary for safe operation, except as provided in subsection (d).

"(3) Exceed the maximum speed limits so long as the driver does not endanger life or property, except as provided in subsection (d).

"(4) Disregard regulations governing direction of movement or turning in specified directions.

"(c) Audible and visual signals required.—The privileges granted in this section to an emergency vehicle shall apply only when the vehicle is making use of an audible signal and visual signals meeting the requirements and standards set forth in regulations adopted by the department, except that an emergency vehicle operated as a police vehicle need not be equipped with or display the visual signals. . . .

"(e) Exercise of care.—This section does not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons."

At trial, the plaintiffs called Officer Mettin. He testified he and Officer Getter were dispatched to the vicinity of Route 611 and Almshouse Road in Doylestown Township, Bucks County, Pennsylvania to be on the lookout for a stolen van driven by a 14-year-old walkaway from a mental health facility in New Britain, Bucks County, Pennsylvania. Getter was driving the marked, fully equipped police car and Mettin was in the passenger seat handling radio transmissions. They spotted the van at 3:27 p.m. at said intersection, turned around and got behind it. Both vehicles were then going south on Route 611, a four-lane highway at the time.

The van was in the southbound shoulder lane with the police car behind it. As soon as Getter activated his overhead lights and the siren, the van sped up and proceeded into the southbound passing lane. The posted speed limit was 45 miles per hour. The van accelerated to speeds in excess of 60 miles per hour. Traffic was heavy.

Halfway between Almshouse Road and Bristol Road, the van moved over into the northbound traffic lanes to pass southbound traffic in front of him. As they approached Bristol Road, the traffic lights were red for them. However, the van, staying in the northbound lanes, ran the red light, passing stopped southbound traffic. At that time, northbound traffic on Route 611 at Bristol Road was also stopped.

Further south, as they approached a red traffic light on Route 611 at the Jomac plant, the van again went into the northbound lanes, through the red light to get around stopped southbound traffic in front of him at that traffic light. When they approached the busy intersection of Route 611 and Street Road, the van went over to the right

shoulder to avoid southbound traffic, turned right onto Street Road with the police car right behind.

Both vehicles then proceeded west on Street Road at speeds of 70 miles per hour in a 35 mile per hour zone, and after two miles, the van turned left on Folly Road, a two lane country road. Again, their speeds were 70 miles per hour in a 35 mile per hour zone. Both vehicles passed out of Doylestown Township and entered Warrington Township. They next approached County Line Road where Folly Road had a stop sign. This was a T-intersection but Mettin did not know that. The van ran the stop sign with the police 30 or 40 yards behind, turning a wide right onto County Line Road and entering into the wrong lane or the eastbound lane. County Line Road is a two-lane road at that point.

Other testimony in the case established that plaintiffs were passengers in a car operated by one Eric Wilburn. All were returning home after work in the aforesaid eastbound lane, where Wilburn was safely operating his vehicle. However, when suddenly confronted with the van, Wilburn had to swerve to the right to avoid a head-on collision with the van. Unfortunately, the van hit a telephone pole to Wilburn's right, causing plaintiffs' severe injuries.

At the time of this pursuit, Chief White's pursuit policy, originated by him in 1990, and adopted by Doylestown Township, provided that this chase be radio monitored by the sergeant on duty, the lieutenant on duty and, if available, the police chief. Any one of these three officers had the right to call off the chase. The officers themselves had the right to call off the chase. If they did, they would suffer no adverse consequences.

However, the radio log (exhibit P-18) revealed that during the pursuit, Mettin never radioed that the van:

(1) was exceeding 60 miles per hour on Route 611;

(2) was going 70 miles per hour on Folly Road;

(3) twice went into the northbound lanes of Route 611;

(4) ran the red light at Route 611 and Bristol Road;

(5) went onto the right shoulder of Route 611 as it approached Street Road.

During the pursuit, Getter and Mettin knew the age, identity and address of the driver of the van. They knew that he was court committed to the Delaware Valley Mental Health Facility in New Britain, Bucks County, Pennsylvania and that the facility had a file on the driver, Bowers.

Mettin admitted in his testimony that they could have arrested Bowers later, and they knew he was headed for his home in the City of Easton, Pennsylvania.

Plaintiffs produced Dr. Randall McCauley, professor of criminology at Indiana University, holding a Ph.D. in criminal justice administration. He has extensive experience in police policies and practices involving police vehicular pursuits, and has formulated and drafted vehicular pursuit policies. He opined that P-13 (authored by Chief White) was a good policy in conformance with the standards in policy, but that Getter and Mettin violated that policy during this pursuit. The officers knew they were pursuing an unskilled and immature driver, who was driving a stolen van that he was not familiar with in heavy traffic. They knew the driver was also exceeding the speed limit, sometimes going into the wrong lanes and violating traffic signals, thereby putting people at risk. Dr. McCauley further opined that Chief White's

pursuit policy was to limit pursuits unless you have very serious circumstances. He did not consider a stolen vehicle, operated by a known suspect, who could be apprehended later, as a very serious circumstance. He concluded that this was an unreasonable pursuit. His opinion was that police high-speed chases are dangerous police procedures; and that in this case, this pursuit created an unreasonable risk of danger to others using the highway.

He also testified that he was familiar with section 3105 of the Motor Vehicle Code which granted certain privileges to police officers when they were using their lights and sirens while engaged in emergency operations, while also requiring that the officers drive with due regard for the safety of all persons. .

It was his opinion that these officers were operating without due regard for the safety of others during their pursuit and that this pursuit should have been terminated by the officers prior to the intersection of Folly and County Line Roads.

Even the defense expert, retired Captain Ronald Traenkle, under cross-examination, twice conceded that the way Bowers was driving presented a clear and present danger to users of the highway. (N.T., 2/3/2000, pp. 151, 154.)

There can be no question but that the testimony set forth above clearly presented a case to be considered by the jury. The court properly refused defendants' motions for directed verdict at the conclusion of plaintiffs' case, and at the close of all of the evidence. See *Dorn v. Stanhope Steel Inc.*, 368 Pa. Super. 557, 534 A.2d 798

(1987) and *Correll v. Werner,* 293 Pa. Super. 88, 437 A.2d 1004 (1981).

Likewise, defendants' present motions for judgment n.o.v. are devoid of merit.

These actions were brought against Police Officer Getter, who was employed by Doylestown Township, and who was acting within the course and scope of his employment and duties on August 10, 1994 in mid-afternoon. Sections 8541, 8542 and 8546 of the Political Subdivision Tort Claims Act, 42 Pa.C.S., are relevant to this case. Likewise, so is section 3105 of the Pennsylvania Vehicle Code, 75 Pa.C.S. relevant to this case.

Section 8542, *supra,* requires plaintiffs to establish by a fair preponderance of the evidence that Getter was negligent in the manner in which he conducted the pursuit in this case, and that his negligence was a substantial factor in causing the harm to the plaintiffs and also that at the time and place he was acting within the scope of his office and duties.

Section 3105, *supra,* requires plaintiffs to establish that Getter, during the pursuit, was not driving with due regard for the safety of all persons.

The jury was obviously satisfied that plaintiffs sustained their burden of proof as to the above.

The Pennsylvania Commonwealth Court very recently visited this area of the civil law concerning police pursuits in *Aiken v. Borough of Blawnox,* 747 A.2d 1282 (Pa. Commw. 2000). The court on March 15, 2000 decided therein that boroughs could be held liable under the motor vehicle exception of the Political Subdivision Tort Claims Act for injuries caused to an innocent motorist injured when suspect's vehicle struck his car dur-

ing a police chase, by actions of boroughs' police officers in negligently maintaining a high-speed chase of a criminal suspect through residential neighborhoods and commercial districts, addressing 42 Pa.C.S. §8542(b)(1). In so deciding, the Commonwealth Court relied upon the Pennsylvania Supreme Court decision in *Jones v. Chieffo,* 549 Pa. 46, 700 A.2d 417 (1997), wherein it was stated that a jury in a proper case must decide whether the pursuing officer's negligence was a substantial factor in causing plaintiff's injuries, and also whether the fleeing suspect's actions were a superceding cause.

The Superior Court, on February 23, 2000, had occasion in *Gunn v. Grossman,* 748 A.2d 1235, 1238 (Pa. Super. 2000) to restate the law concerning trial courts' rulings on requests for judgment notwithstanding the verdict in the following language:

"In reviewing a motion for a judgment n.o.v., the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom and any conflict in the evidence must be resolved in his favor. Moreover, a judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further[,] a judge's appraisement of the evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations. There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With

the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992). Accord *Nogowski v. Alemo-Hammad,* 456 Pa. Super. 750, 758-64, 691 A.2d 950, 955-57 (1997) (en banc), *appeal denied,* 550 Pa. 684, 704 A.2d 638 (1997). In making the determination of whether judgment n.o.v. is appropriate, our scope of review is plenary as it is with any review of questions of law. *Davis v. Berwind Corp.,* 547 Pa. 260, 266, 690 A.2d 186, 189 (1997). *Boutte v. Seitchik,* 719 A.2d 319, 322-23 (Pa. Super. 1998).

"*Rohm and Haas Co. v. Continental Casualty Co.,* 732 A.2d 1236, 1247-48 (Pa. Super. 1999). A judgment n.o.v. should be entered only in a clear case. *Nogowski v. Alemo-Hammad, supra."* *Gunn v. Grossman,* 748 A.2d 1235, 1238-39 (Pa. Super. 2000).

In this case, this court's refusal to grant judgment notwithstanding the verdicts is proper. This was clearly for the jury to decide.

Defendants in their post-trial motions and their briefs also raise several other issues. They argue that the court erred in allowing Dr. McCauley to testify as plaintiffs expert witness on police pursuits. Our appellate courts have decided the trial judges have broad discretion in allowing expert testimony in trials. See *Walsh v. Kubiak,* 443 Pa. Super. 284, 661 A.2d 416 (1995). Dr. McCauley was qualified in the mind of this judge; therefore, the

weight of his testimony was for the jury. Also, the allowance by the court on voir dire for Dr. McCauley to answer a question as to whether or not he was ever hired by Bensalem Township as an expert witness was not error by the court.

Next, it is argued that the court erred in allowing plaintiffs' witness Officer Connie A. Johnson, who arrived at the scene of the accident, to read to the jury the statement she took from Eric Wilburn. (N.T., 2/1/2000, p. 38, l. 18 to p. 39, l. 5.) This was never objected to by the defense at the time. Later, during cross-examination, they objected to a question in another portion of Officer Johnson's report, concerning Wilburn's driving. (N.T., 2/1/2000, pp. 66, 67.) This also addressed the earlier unobjected to testimony by Officer Johnson. (N.T., 2/1/2000, pp. 38, 39.) If this was error, it was certainly harmless error.

Moving on, defense argues the court erred in overruling the defense objection to the following question by plaintiffs' counsel during their direct examination of Officer Mettin:

"Q. But you never saw the Plymouth coming eastbound at the time the van made its right turn?

"A. No."

This was a proper question. There is no merit to this argument. (N.T., 2/1/2000, p. 109.)

The defense at trial objected to showing the jury a video of the pursuit route taken years after the accident at plaintiffs' expense. They objected to commentary of the video operator and to the changes made on Route 611 since 1994. In response to these objections, the court suggested that Officer Mettin give all commentary during the video

and also point out to the jury the various changes in Route 611 over the years.

Everyone agreed to this suggestion except the township attorney, who then argued that this procedure would be "prejudicial." That objection and this present argument are captious.

Next, defendants argue that the trial court made erroneous rulings during the defense testimony of Officer Daniel Getter and, therefore, they should get a new trial. On pages 21 and 22 of their brief, they argue this occurred on cross-examination of Getter. In order to put their arguments in perspective, it is necessary to refer to Getter's defense testimony on direct examination.

Getter testified that on the day in question, he and Officer Mettin arrived at work early for their 3 p.m. to 11 p.m. shift. At headquarters, by monitoring the police radio, they learned that a van had been stolen in New Britain, Bucks County, Pennsylvania, and a subject escaped from a mental health facility near the location of the van theft by going through a second-floor window. Getter and Mettin then surmised that that subject stole the van. (N.T., 2/2/2000, pp. 172, 174.)

He further testified that they heard Chief Sempowski of New Britain "continually" relaying information over the radio, including a description of the subject (Bowers) and that he armed himself with a screwdriver. (N.T., 2/2/2000, p. 176.) After hearing that, they left headquarters in the one remaining police car and proceeded to Route 611 and Almshouse Road in their township. While there, they spotted the van, and the driver matched the previous description. A radio call confirmed the license plate as the stolen van.

In response to a question from the trial judge, Getter testified that Chief Sempowski stated over the radio that Bowers was court committed and there were charges pending against him, which meant to Getter that Bowers was either a danger to himself or someone else. (N.T., 2/2/2000, p. 184, l. 2.)

On page 188 of the Notes of Testimony of February 2, 2000, Getter testified that Bowers armed himself with a screwdriver and stole the van.

In light of the above, the court correctly allowed cross-examination of Getter concerning information in Chief Sempowski's police report that Bowers walked up to a gentleman and asked to "borrow" a screwdriver. (N.T., 2/3/2000, p. 5.)

Defense also argues the trial court erred in sustaining an objection on direct examination to a question that Delaware Valley Mental Health employees were instructed to stay away from Bowers. The exact testimony is as follows:

"The staff of the facility advised that they were not to approach him (Bowers) because they believed that he—
. . .

"Objection . . .

"Objection . . .

"The Court: Objection sustained on any speculation as to what the staff may or may not have believed.

"Mr. Gonzales: Okay." (N.T., 2/3/2000, p. 205.)

This was a correct ruling by the court.

Again, it argued that the court erred in not permitting Getter, on redirect, to explain to the jury what the Edison Juvenile Detention Facility was and why Bowers was sent there. The Notes of Testimony show the following:

"Q. Now, Jeremy Bowers, as we know, ultimately was sent to, I think you testified to the Edison Detention Facility; is that correct?

"A. Yes, . . .

"Q. Do you know he was sent there?

"Mr. Senoyuit: Objection.

"The Court: Sustained." (N.T., 2/3/2000, p. 55.)

Again, this was a proper ruling. The essence of the case is what Getter and Mettin knew during the police pursuit, not what they found out later, or what happened later.

In concluding this portion of the defense argument, they allude to what plaintiffs' counsel stated in his closing argument. Closing arguments were not recorded. This is improper argument.

The defense argues the court incorrectly charged the jury that plaintiffs do not have to prove physical contact between the police vehicle and plaintiffs' vehicle. This was a correct statement of the law. See *Jones v. Chieffo, supra.*

It is argued that the court erred in discussing the township's pursuit policy with the jury. Again, when this is read in the context of the entire charge, it is not erroneous. In making this argument, defense counsel again tried to incorporate into their brief, portions of the unrecorded closing arguments. Again, this is not proper.

They complain about a portion of the court's charge on damages. This is out of context and devoid of merit.

Next, an argument is made that the court erred in allowing exhibits to go out to the jury. This was within the court's discretion and did not constitute error. See *Kearns v. Clark,* 343 Pa. Super. 30, 493 A.2d 1358 (1985).

Their last argument is on the subject of the verdicts and they argue for remittitur or a new trial.

Originally, the jury verdict for Dorsey Williams was $1,679,000 and $542,000 for Arnold Tolbert, or total verdicts in the amount of $2,221,000. To comply with the Political Subdivision Tort Claims Act, their verdicts were molded to $500,000 in the aggregate, thereby reducing Dorsey Williams' verdict to $378,000 and Tolbert's verdict to $122,000.

Thereafter, a petition for delay damages in accordance with Pennsylvania Rule of Civil Procedure 238 was filed, which was responded to by defendants. On February 28, 2000, this court, following *Woods v. PennDOT,* 531 Pa. 295, 612 A.2d 970 (1992), computed delay damages on the *original* verdicts at a total of $516,184.73, which when added to the aforesaid $500,000 was molded by this court to $1,016,184.73.

While defendants, in their supplemental post-trial motions, disputed the calculations as to the court order of February 28, 2000 on delay damages, they failed to address this issue in their subsequent brief or at oral argument.

It would, therefore, seem to this court that since the verdicts were molded from $2,221,000 to the $500,000. aggregate to comply with the Political Subdivision Tort Claims Act, that the defendants' present argument as to the excessiveness of the verdicts has become moot.

Presently, the excessive argument would seem to only relate to the court's calculation of delay damages. And since defendants did not set forth in their brief any argument against the delay damages order of this court of

February 28, 2000, that would constitute a waiver of this issue.

However, in the exercise of extreme caution by this court in the event of an appeal, we will nevertheless address the remittitur question.

As a result of this accident Dorsey Williams and Arnold Tolbert both suffered severe, extensive and permanent injuries. Dorsey Williams' injuries included a comminuted fracture on the distal humerus, comminuted fracture of the proximal shaft of the ulna, comminuted fracture of the proximal shaft of the humerus, nondisplaced fracture of the proximal shaft midshaft and distal shaft of the right tibia, displaced fracture of the right femur, laceration of the spleen and liver requiring surgical removal of spleen, open and mildly displaced right parsymphyseal mandible fracture, dental alveolar fracture, parasagital fracture of the hard palate on the right, bilateral subconclylar fracture of the mandible with bilateral temporal joint dislocation, comminuted fracture of the right maxillary sinus, zygomatic-maxillary component and fracture of the posterior wall extending to the pterygoid plate, fracture of the right postero-lateral orbit, fracture of the right zygomatic arch, fracture of the left maxilla. Mr. Williams' facial injuries required his jaw to be wired shut for a considerable length of time. He was hospitalized for a few weeks time immediately following the accident and on several occasions thereafter. As a direct result of his injuries, Mr. Williams has undergone extensive and numerous surgical procedures. He has been left with extensive and unsightly scars as a result of his injuries and surgical treatment. At the time of trial, Mr. Williams presented the expert medical testi-

mony of Dr. Albert Weiss, a board certified orthopedic surgeon, and Dr. Michael Loftus, a board certified oral and maxillofacial surgeon to discuss his injuries and medical treatment. Both doctors opined that all of Mr. Williams' injuries were the result of the August 10, 1994 accident. The defendants did not present any medical testimony relative to the injuries suffered by Mr. Williams in the August 10, 1994 accident or any of the medical treatment, which he has received as a result of his injuries.

Arnold Tolbert's injuries included a right zygomatic arch fracture, right mandibular fracture, comminuted maxillary sinus fracture, soft tissue injury to the right thigh including deep thigh contusion, and a serious postoperative infection. Mr. Tolbert was hospitalized at the Medical College Hospital and University of Pennsylvania Hospital following this accident. At the University of Pennsylvania Hospital, Mr. Tolbert underwent extensive surgery to reconstruct the numerous facial fractures he received in this accident. Mr. Tolbert's jaw was wired shut for an extended period of time. Following his discharge, Mr. Tolbert was readmitted to University of Pennsylvania Hospital for approximately one week in connection with the treatment of a serious postoperative infection. This accident has left Mr. Tolbert with facial scars. During the course of trial, Dr. Scott Bartlett, a board certified plastic and reconstructive surgeon, testified on behalf of Mr. Tolbert regarding his injuries and medical treatment. The defendants offered no medical testimony of any nature relative to any aspect of Mr. Tolbert's injuries or his medical treatment or care.

In discussing remittitur, the Superior Court in *Doe v. Raezer,* 444 Pa. Super. 334, 340, 664 A.2d 102, 105 (1995), stated:

"Normally, the determination of the amount of damages that a person is to be awarded for pain and suffering, both past and future, is primarily a jury question. . . . Judicial reduction of a jury award for compensatory damages is appropriate only when the award is plainly excessive and exorbitant in a particular case. . . . The trial court may grant a request for remittitur only when a verdict that is supported by the evidence suggests that the jury was guided by partiality, prejudice, mistake or corruption. . . .

"A remittitur should fix the highest amount any jury could properly award, give due weight to all the evidence offered."

In my judgment, the verdicts in this case fall within the uncertain limits of fair and reasonable. I do not consider them excessive or exorbitant. These verdicts do not shock my sense of justice. I do not believe this jury was influenced by partiality, prejudice, mistake or corruption. Both of these plaintiffs were seriously injured. They underwent substantial medical attention over long periods of time. They endured great pain and suffering, some of which may continue into the future. They have not been able to be gainfully employed since the accident. None of their medical testimony was challenged at trial.

In light of all of the above, this court enters the following:

## ORDER

And now, September 7, 2000, after oral argument, review of the extensive record, and the respective briefs of both counsel, defendants' post-trial motions are denied, overruled and refused.