Michele VOGELSBERGER, Appellant,

v.

MAGEE–WOMENS HOSPITAL OF
UPMC HEALTH SYSTEM and An-
thony F. Gentile, M.D., Appellees.

Michele Vogelsberger, Appellee,

v.

Magee–Womens Hospital of UPMC
Health System and Anthony F.
Gentile, M.D.,

Appeal of: Magee–Women's Hospital of
UPMC Health System, Appellant.

Superior Court of Pennsylvania.

Argued April 19, 2006.
Filed June 21, 2006.
Reargument Denied Aug. 29, 2006.

542

Anthony A. Seethaler, Pittsburgh, for Vogelsberger.

Diane B. Quinlan, Pittsburgh, for Gentile.

Anthony J. Williot, Pittsburgh, for Magee–Women's.

Robert B. Hoffman, Harrisburg, for Pa. Medical Society, Amicus Curiae.

BEFORE: DEL SOLE, P.J.E., BENDER and JOHNSON, JJ.

OPINION BY BENDER, J.:

¶ 1 Michelle Vogelsberger (Vogelsberger), the plaintiff in this medical malpractice case, appeals from the trial court's order granting remittitur in the amount the jury awarded in noneconomic damages against the defendants, Anthony F. Gentile, M.D. (Dr. Gentile), and Magee–Womens Hospital of UPMC Health System (Hospital). She also asserts, *inter alia,* that the trial court erred by dismissing her breach of contract claim against Dr. Gentile on summary judgment. Her claims against Dr. Gentile were premised on his failure to prophylactically remove her ovaries at the time he performed her hysterectomy, and her claims against the Hospital stem from an episode of respiratory depression that occurred following her hysterectomy due to the morphine she was receiving for pain control. Additionally, Hospital filed a cross-appeal in which it argues that Vogelsberger failed to establish causation between Hospital's negligence and Vogelsberger's injuries. Also, both of the defendants have filed motions with this Court seeking to have Vogelsberger's appeal quashed. For the following reasons, we deny the defendants' motions to quash, affirm the trial court's grant of remittitur, reverse the trial court's grant of summary judgment on the breach of contract claim, and affirm the trial court's order denying Hospital relief, since Vogelsberger did present sufficient evidence of causation.[1]

1. We are in receipt of amicus curiae briefs from (1) the Pennsylvania Trial Lawyers Asso-

¶ 2 A factual history follows. Vogelsberger began having pelvic pain in 1995, which she reported to her gynecologist at the time, Hossein Noorbakhsh, M.D. N.T. Trial, 1/25–30/05, at 119–120. While under his care, Vogelsberger had a laparoscopy done in September of 1998 for complaints of abdominal pain and heavy periods lasting two weeks or more. *Id.* at 60. During the laparoscopy, Dr. Noorbakhsh believed he had observed endometriosis. *Id.* at 329.[2]

¶ 3 When Vogelsberger's insurance coverage changed, she was referred to Dr. Gentile. *Id.* at 61. Her first visit to Dr. Gentile's office was on March 12, 1999, where she was seen by a nurse practitioner. *Id.* at 62. Vogelsberger was just turning 32 years old at that point. At that first visit, Vogelsberger completed a questionnaire that included her past medical and family history. *Id.* at 63, 579. With regard to family medical history, Vogelsberger indicated that her mother had ovarian cancer and that her maternal aunt had uterine and cervical cancer. *Id.* at 63–64, 581. In fact, Vogelsberger's mother died of ovarian cancer in her mid-thirties, when Vogelsberger was seven years old. *Id.* at 116, 284. Vogelsberger reported to the nurse practitioner that she was having abdominal pain, heavy periods, and pain with intercourse, but she could not recall if she told the nurse practitioner about her concerns about developing ovarian cancer. *Id.* at 126. The nurse practitioner testified that Vogelsberger did not indicate that she had a fear or concern about ovarian cancer or that she wanted to have her ovaries removed prophylactically. *Id.* at 580.[3] Vogelsberger told the nurse practitioner that she had an ultrasound that showed fibroids and that she had been diagnosed with endometriosis in 1998 via laparoscopy. *Id.* at 582. Dr. Gentile's office sent Vogelsberger for a pelvic ultrasound, which revealed fibroids[4] in her uterus, but normal ovaries. *Id.* at 66–67, 287–88, 586.

¶ 4 Following the ultrasound, Vogelsberger went to a second appointment at Dr. Gentile's office on April 28, 1999, where Dr. Gentile examined her and discussed her ultrasound results. *Id.* at 66–67, 126, 651. He suggested removing her uterus due to the large fibroids therein. *Id.* at 67. Vogelsberger stated that she notified him of her concerns about developing ovarian cancer. *Id.* at 127. According to Vogelsberger, Dr. Gentile also suggested removing her ovaries due to her mother's history of ovarian cancer. *Id.* at 68. However, she later stated that she could not remember who raised the issue of removing her ovaries but, due to her concern about her mother's history of ovarian can-

---

ciation (PaTLA), in support of Vogelsberger's position that remittitur was improper; and (2) the Pennsylvania Medical Society, in support of Dr. Gentile's argument that the trial court properly granted remittitur of noneconomic damages.

2. According to Vogelsberger's gynecology expert at trial, David Burkons, M.D., "[e]ndometriosis is tissue that normally lines the uterus which is found in places other than the lining of the uterus, most usually the ovaries, peritoneal cavity, and so on[,]" and it can result in "anything from no symptoms at all to severe pain, infertility." N.T. at 328.

3. Dr. Gentile testified that "[p]rophylactic oophorectomy means removal of normal ovaries which are not yet diseased." N.T. at 631. In his 32 years of practice, he could only remember one patient (not Vogelsberger) who came to him for a prophylactic oophorectomy. *Id.*

4. Dr. Burkons testified that "[f]ibroids are muscular growths within the uterus.... They tend to cause problems where they are located in the uterus and distort the uterine cavity and cause heavy periods and bleeding." N.T. at 333. Dr. Gentile described fibroids as muscle tumors in the uterus that are almost always benign. *Id.* at 616–17.

cer, she stated that she and Dr. Gentile mutually agreed to remove her ovaries. *Id.* Thus, Vogelsberger testified that her treatment plan at that point included a total abdominal hysterectomy ("TAH"), or removal of the uterus, and bilateral salpingo-oophorectomy ("BSO"), or removal of both ovaries and fallopian tubes. *See id.*

¶ 5 In his April 28th office note, Dr. Gentile wrote that he "suggested definitive therapy in the form of TAH, BSO[.]" *Id.* at 627–28, 651. He explained that "definitive therapy" is a therapeutic procedure done to alleviate symptoms or eliminate a condition that has been previously diagnosed. *Id.* at 617. Dr. Gentile stated that definitive therapy for a fibroid uterus in a patient who is no longer desirous of childbirth is a TAH. *Id.* at 619. However, when treating younger, premenopausal patients with fibroids and endometriosis, like Vogelsberger, Dr. Gentile stated that there are several risks in removing the ovaries, which supply the body with estrogen. *Id.* at 621, 626. As of 1999, removal of the ovaries put such patients into menopause and, thus, at increased risk for such conditions as osteoporosis and cardiovascular disease. *Id.* at 621, 627. Accordingly, Dr. Gentile explained that, although he received Vogelsberger's permission to do the TAH and a BSO, his treatment plan involved the TAH for definitive treatment because it had been well-established that Vogelsberger had fibroids, but that he would do the BSO in addition to the TAH *only* if he found significant endometriosis on the ovaries. *Id.* at 619–20, 628. Also, Dr. Gentile testified that if Vogelsberger had made a complaint with regard to her fear of ovarian cancer, he would have documented that in her medical record, but nothing in the record suggested that she had communicated this fear to Dr. Gentile. *Id.* at 637.

¶ 6 Also on April 28th, Vogelsberger signed an informed consent form wherein she authorized Dr. Gentile and/or his assistants to perform a "TAH/BSO." Consent to Surgery and Anesthesia, 4/28/99, at 1. She again testified that she thought Dr. Gentile would remove not only her uterus, but also both ovaries and fallopian tubes. N.T. at 70. Vogelsberger's expert at trial, Dr. Burkons, stated that, according to his review of the records, specifically the informed consent form and Dr. Gentile's preoperative office note, both dated April 28, 1999, it appeared that the treatment plan included a TAH and prophylactic BSO. *Id.* at 288, 292–93, 295–96.

¶ 7 Contrary to this position, Dr. Gentile testified that he uses the consent form as a method of teaching and tells the patient that it indicates what he "will do or may do … depending on the circumstances" and allows him to get the patient's permission to allow him to do certain procedures for conditions that may be revealed during the time of surgery. *Id.* at 613. Again, in Vogelsberger's case, Dr. Gentile stated that if the condition of her ovaries as observed during surgery warranted their removal, he would have removed them. *Id.*

¶ 8 The next time Vogelsberger saw Dr. Gentile was preoperatively, on the morning of her surgery at Hospital on May 7, 1999. *Id.* at 72. He saw her in the preoperative area, reviewed her chart, the consent form, and spoke to her about the planned procedures. *Id.* at 646. He told Vogelsberger that he "may do a TAH, BSO." *Id.* at 647. In the history and physical section of her medical record, he documented that she was to have a TAH and a *possible* BSO. *Id.*

¶ 9 Following surgery, at 9:30 a.m., Vogelsberger was brought to the recovery room. *Id.* at 197, 247. Dr. Gentile and another doctor visited Vogelsberger in the

recovery room at 10:00 a.m. *Id.* at 435. While in the recovery room, the recovery room nurse set-up patient controlled analgesia (PCA) that would allow Vogelsberger to press a button that would trigger administration of a dose of morphine from a pump hooked-up to an intravenous catheter. *Id.* at 467–68. The PCA pump has a lockout mechanism to protect against overdose and was programmed to deliver only one milligram of morphine in any six-minute period, with a total aggregate hourly limit as further prescribed by the anesthesiologist. *Id.* at 386, 425, 530. Additionally, the pump was programmed so that no more than 30 milligrams of morphine could be delivered in any four-hour time period. *Id.* at 528. The recovery room nurse instructed Vogelsberger with regard to how to self-administer morphine through the PCA pump. *Id.* at 425. In addition to the patient-controlled doses, the recovery room nurse gave 2 milligram "loading doses" of morphine from the PCA pump in order to relieve Vogelsberger's postoperative pain. *Id.* at 248, 426–427.

¶ 10 While in the recovery room, Vogelsberger was intermittently asleep and awake, and her respiratory rate was normal. *Id.* at 423, 428. At 11:00 a.m., after noting that Vogelsberger had minimal pain and nausea, no bleeding, normal breathing and oxygen saturation on room air, and appeared stable in other respects, the recovery room nurse, upon order of the anesthesiologist, transferred Vogelsberger out of the recovery room and into a room on the regular floor. *Id.* at 428, 430, 432, 434, 464.

¶ 11 Upon admission to the regular floor, Vogelsberger's vital signs, including her respiratory rate, were normal, and her neurological assessment, including her level of alertness and orientation, was normal. *Id.* at 469, 471–72. One of the floor nurses conducted a full assessment and instructed Vogelsberger with regard to the use of the PCA pump. *Id.* at 472. Shortly after being transferred into a regular room, *i.e.*, at approximately 11:15 a.m. to 11:25 a.m., nurses administered another loading dose of morphine from the PCA pump, and they administered Compazine, which is a common postoperative treatment for nausea. *Id.* at 456, 474–75, 504–05, 508, 512.

¶ 12 Also, at some point, a nurse instructed Vogelsberger's husband, who was present in the room, that if Vogelsberger was not able to hit the button to trigger delivery of a dose of morphine through the PCA pump, he could press it for her. *Id.* at 367. He did so on two occasions because "the nurse said it was okay to." *Id.* at 369. He stated, "[b]ecause the nurse said while [Vogelsberger] was sleeping and resting it would be a good idea to administer so that it would keep her resting pain-free [sic]." *Id.* at 372. Vogelsberger's sister also testified that the nurse told her it was okay to press the button for Vogelsberger because Vogelsberger, after just coming up from the recovery room, was "not really understanding" how to use the PCA pump on her own. *Id.* at 383–84. At the time, Vogelsberger appeared to be in "an extraordinary amount of pain and crying[,]" so her sister assisted her, with the nurse's instruction, in pushing the button on the PCA pump. *Id.* at 385. Vogelsberger's sister pushed the button three times. *Id.* at 386.

¶ 13 At 11:40 a.m., one of the nurses documented that Vogelsberger was sleeping with her sister at her side. *Id.* at 475. She assessed Vogelsberger's respirations and concluded that they were normal. *Id.* at 476, 514. Although an assessment of the effects of the PCA, like depressed respirations, was required at noon, the nurse agreed that she did not do this assessment at noon. *Id.* at 522.

¶ 14 At 12:23 p.m., as Vogelsberger's husband was reading by her bedside, he noticed that her "breathing slowed down a great deal[,]" so he went out of the room and notified the nurses. *Id.* at 369. The nurses responded immediately. *Id.* at 369, 478. Vogelsberger's respiratory rate at that time was depressed at six breaths per minute, so the nurses called for assistance. *Id.* at 478.

¶ 15 Apparently, Vogelsberger suffered respiratory depression from the sedating effects of the morphine she was being given for pain in combination with the sedating effects of the anti-nausea medication. *Id.* at 214, 217, 219, 551. A code (*i.e.,* a procedure whereby a team of doctors and nurses respond to a respiratory and/or cardiac arrest to provide emergency life-sustaining treatment) was called at 12:24 p.m., and mouth-to-mouth resuscitation was commenced. *Id.* at 216, 270, 479–81. At 12:31 p.m., Narcan, a medication that reverses the sedative effect of opioids like morphine, was administered to Vogelsberger. *Id.* at 481, 553. The code team resuscitated Vogelsberger within ten to twelve minutes, following which time Vogelsberger was breathing on her own and speaking to the code team members. *Id.* at 272, 482. At no point did Vogelsberger stop breathing completely. *Id.* at 481.

¶ 16 After being resuscitated, she was sent to the intensive care unit for the night. *Id.* at 272, 482. While there, she was alert and talking. *Id.* at 375–76. Dr. Gentile called Vogelsberger's ICU room to see how she was doing. *Id.* at 379. She returned to the regular floor room the following morning. *Id.* at 272. Following the respiratory arrest, Vogelsberger was taken off the morphine and given non-narcotic pain medications. *Id.* at 239.

¶ 17 Prior to discharge, on the evening of May 10, 1999, Vogelsberger's sister told Vogelsberger that her ovaries had not been removed. *Id.* at 85, 363. Vogelsberger's best friend, Kelly Albert, was present at the time and was "astounded" that the BSO had not been performed because "that was one of the reasons that [Vogelsberger] went in for her surgery[.]" *Id.* at 397. Vogelsberger stated that she did not ask Dr. Gentile about the failure to remove her ovaries because she did not see him postoperatively in the hospital. *Id.* at 87–88.

¶ 18 Vogelsberger's husband took her home on May 11, 1999, but she was not able to get into the house on her own due to pain. *Id.* at 369. The Brentwood EMS service carried Vogelsberger into her home. *Id.* at 398. Vogelsberger was in a lot of pain on the day of discharge. *Id.*

¶ 19 The next time Vogelsberger saw Dr. Gentile was for her follow-up postoperative visit to his office on June 2, 1999. *Id.* at 92. However, she did not ask him about his failure to remove her ovaries. *Id.* at 93. She saw him in the office again on June 30, 1999, but, again, did not inquire about the failure to remove her ovaries. *Id.* at 94. In all, she returned to Dr. Gentile's office for three postoperative visits, but she admitted that she did not indicate to anyone there that she was upset that her ovaries had not been removed. *Id.* at 130.

¶ 20 During the next 4½ to 5 years, Vogelsberger conversed with her friend Kelly Albert "several times" about her fear of developing ovarian cancer and fear of surgery due to the respiratory event that occurred after her TAH. *Id.* at 401–402. Kelly helped her overcome her fear of surgery so that Vogelsberger would eventually get her prophylactic BSO as described *infra.* *Id.* at 402–403.

¶ 21 In the meantime, in late 1999, Vogelsberger had a barium enema at St. Clair Hospital. *Id.* at 103. In November

of 2002, Vogelsberger returned to see her former gynecologist, Dr. Noorbakhsh, with complaints of general abdominal pain, pain when trying to move her bowels, and a "tremendous amount of constipation." *Id.* at 101–102, 131–132, 172. He recommended twice yearly ultrasounds of the ovaries and CA–125 blood tests to screen for cancer. *Id.* at 101. Although Vogelsberger claimed to have gone for ultrasound and blood tests twice per year, the medical records belied this assertion. *Id.* at 102. Vogelsberger's own expert, Dr. Burkons, agreed that she did not properly follow-up with these tests to the extent that they were recommended. *Id.* at 343–44.

¶ 22 On January 20, 2004, Vogelsberger passed out at home while trying to move her bowels. *Id.* at 103. Dr. Noorbakhsh ordered two more ultrasounds, which were performed on February 28, 2004, and April 5, 2004. *Id.* at 104. Dr. Noorbakhsh saw Vogelsberger on May 5, 2004. *Id.* at 173. At that time, Vogelsberger reported pelvic pain and had "gone through a few different tests and . . . felt somewhat better but still . . . had the pain and she wanted something definite to be done about it." *Id.* at 173–74. The ultrasound tests were negative. *Id.* at 174. Vogelsberger told Dr. Noorbakhsh that she wanted to have her ovaries removed. *Id.* at 132. These records from 2004 are the first place wherein it is *charted* that Vogelsberger requested prophylactic removal of her ovaries. *Id.* at 337.

¶ 23 Dr. Noorbakhsh referred her to another gynecologist, Dr. Deitrick, who saw her on May 26, 2004. *Id.* at 135, 147, 174. She told Dr. Deitrick about her history of endometriosis that had been confirmed by laparoscopy and about her subsequent TAH for fibroids. *Id.* at 136. She informed Dr. Deitrick that her ovaries had not been removed. *Id.* She also informed him of having pelvic pain, but she

could not tell whether the pain was related to a gynecological problem or a gastroenterological problem. *Id.* at 137. She told him that she wanted a prophylactic oophorectomy. *Id.* at 327.

¶ 24 Dr. Deitrick testified that "it was clear at some point she wanted her ovaries out[,]" but he suggested several options, including a laparoscopy to determine the cause of the pelvic pain, and "if the pain was due to adhesions or some other condition, you could leave the ovaries there and she could have them out at any time in the future." *Id.* at 150. However, since he would be doing a laparoscopy anyway, with Vogelsberger under anesthesia, he also presented the option of taking out the ovaries during that procedure to save her from having to undergo an additional surgery and anesthesia in the future. *Id.* at 151. In the medical record, he indicated that Vogelsberger wanted her ovaries out at some point, but it did not really matter whether it was done at that time or a few years later. *Id.* at 140, 167. In any event, he testified that Vogelsberger chose to have the ovaries removed during the laparoscopy. *Id.* at 151.

¶ 25 On July 16, 2004, at Mercy Hospital, Dr. Deitrick performed the laparoscopy, during which he noted that both ovaries and tubes were adhered to the anterior pelvis by adhesions and covered by two different loops of bowel. *Id.* at 107, 115, 153–54. Dr. Burkons explained that because the ovaries are free-floating and not covered by a protective peritoneum like other abdominal organs, they are more prone to stick, form adhesions, and cause pain. *Id.* at 358. Dr. Deitrick removed both ovaries and tubes (*i.e.*, performed the BSO) and lysed, or cut, the adhesions. *Id.* at 108. Vogelsberger was hospitalized at Mercy Hospital for three days thereafter. *Id.* at 115. The pathology report indicated

that the ovaries were normal. *Id.* at 167–168.

¶ 26 Vogelsberger's symptoms subsided after that surgery with Dr. Deitrick. *Id.* at 108. However, her incision "opened up a little bit" requiring her to cleanse the wound and take antibiotics. *Id.* at 109. Dr. Deitrick stated that her incision kept draining, healed for awhile in December of 2004, but started draining again thereafter. *Id.* at 154. Thus, he referred her to a plastic surgeon for scar revision. *Id.* She consulted with the plastic surgeon and eventually, on January 7, 2005, the plastic surgeon put her under local anesthesia for outpatient surgery to repair the wound. *Id.* at 110.

¶ 27 Vogelsberger filed a complaint against Dr. Gentile and Hospital. In Count I of the complaint, Vogelsberger set forth a claim of breach of contract against Dr. Gentile in which she alleged that his failure to remove her ovaries was in contravention of their express oral agreement that he would do so, and that this agreement was reduced to writing as per Dr. Gentile's April 28th preoperative office note and the informed consent form. Complaint, 7/31/01, at ¶¶ 10–14, 18. Count II of the complaint sounded in negligence against Dr. Gentile, premised also on his failure to perform the BSO. *Id.* at ¶¶ 20–22. In Count III of the complaint, she set forth a claim of negligence against Hospital premised on, *inter alia,* the failure to properly monitor the effects of the morphine, resulting in respiratory arrest. *Id.* at ¶¶ 23–28.[5]

¶ 28 On January 6, 2004, Dr. Gentile filed a motion for summary judgment, seeking dismissal of the breach of contract claim and the negligence claim. On April 14, 2004, the trial court granted this mo-

tion in part, by striking the breach of contract claim only.

¶ 29 The case proceeded to trial before a jury from January 25, 2005, through January 30, 2005. The jury returned a verdict against Dr. Gentile for noneconomic damages consisting of "pain and suffering, physical pain, mental anguish, discomfort, inconvenience and distress" in the amount of $200,000, and for "[e]mbarrassment, humiliation" in the amount of $50,000. N.T. at 855. The jury returned a verdict against Hospital in the amount of $350,000 for "[p]ain and suffering, physical pain, mental anguish, inconvenience and distress[.]" *Id.* In all, the jury awarded Vogelsberger noneconomic damages in the aggregate amount of $600,000, with $350,000 attributed to Hospital, and $250,000 attributed to Dr. Gentile. The defendants filed post trial motions seeking, *inter alia,* remittitur of the verdicts.

¶ 30 On May 24, 2005, the trial court entered an order denying in part and granting in part the post trial motions of Dr. Gentile and Hospital. Specifically, the court denied the defendants' motion for judgment notwithstanding the verdict and motion for new trial on the issue of liability. Order, 5/24/05. However, the court granted the defendants' motion for remittitur. The court ordered that Hospital was liable to Vogelsberger for noneconomic damages in the reduced amount of $75,000, and that Dr. Gentile was liable to Vogelsberger for noneconomic damages in the reduced amount of $125,000. In the aggregate, the trial court reduced the amount of from $600,000 to $200,000. The trial court then instructed as follows:

> Plaintiff [Vogelsberger] is directed to file a remittitur reducing the verdicts of

---

5. Although Vogelsberger refers to the incident as a respiratory arrest, the trial record reveals that she suffered a respiratory depression. However, the characterization of the incident is not pertinent for purposes of this appeal.

the jury in excess of the above referenced amounts. If Plaintiff files the remittitur of the verdicts within twenty (20) days from the date of this Order, then Defendants' Motions for a New Trial on the issue of damages will be denied, and judgments shall be entered on the verdicts, as amended. *If Plaintiff rejects the remittitur of either of the two jury verdicts and/or does not file her acceptance thereto within twenty (20) days from the date of this Order, then one or more of the Defendants' Motions for a New Trial on the issue of damages will be granted.*

*Id.* (emphasis added). On June 8, 2005, Vogelsberger filed a rejection of the remittitur with regard to both defendants. Vogelsberger filed this appeal on June 20, 2005. Hospital filed a cross-appeal on June 22, 2005. Dr. Gentile has not filed an appeal herein.

■ ¶ 31 We must first address the motions the defendants have filed with this Court to quash Vogelsberger's appeal. The defendants argue that Pa.R.C.P. 1042.72 prohibits Vogelsberger from immediately appealing the trial court's grant of remittitur. The defendants' position is that Vogelsberger must first proceed through the new trial on noneconomic damages before she can appeal. Vogelsberger, on the other hand, argues that nothing in Pa.R.C.P. 1042.72 prevents her from taking an interlocutory appeal as of right, pursuant to Pa.R.A.P. 311(6), from the grant of a new trial.[6]

¶ 32 Accordingly, the defendants' motions to quash require this Court to reconcile the application of Pa.R.C.P. 1042.72 and Pa.R.A.P. 311(6) to the circumstances before us. This presents an issue of first impression in Pennsylvania. We begin our analysis by examining Pa.R.C.P. 1042.72, which was promulgated by the Supreme Court of Pennsylvania in response to the medical liability reform measures of the Medical Care Availability and Reduction of Error (MCARE) Act, which was enacted on March 20, 2002.

¶ 33 The MCARE Act specifically addresses, *inter alia,* remittitur in professional liability cases. Although we will explore the substantive content of the remittitur statute more fully below, for purposes of determining the defendants' motion to quash, we are satisfied that the General Assembly intended that appellate courts would review grants and denials of remittitur in medical malpractice cases, and that they have specified guidelines for review. 40 P.S. § 1303.515.

¶ 34 In response to the remittitur provision in the MCARE Act, our Supreme Court, on September 17, 2004, adopted Pa.R.C.P. 1042.72, which provides additional guidance on remittitur. Again, other portions of the rule will be explored more fully below along with our discussion about whether the court properly granted remittitur. For now, the rule reads in pertinent part as follows:

**Rule 1042.72. Medical Professional Liability Actions. Motion for Post-**

---

**6.** We note that an order for a new trial was never entered following Vogelsberger's rejection of remittitur. However, in the interest of judicial economy, we will "regard as done that which ought to have been done." *Johnston the Florist, Inc. v. TEDCO Const. Corp.,* 441 Pa.Super. 281, 657 A.2d 511, 514–15 (1995) (citation omitted). The language of the trial court's order anticipated the entry of an order for a new trial upon Vogelsberger's rejection of remittitur, and Pa.R.C.P. 1042.72 mandates the grant of a new trial following rejection of remittitur. Accordingly, we will proceed as if an order granting a new trial had been entered on the date Vogelsberger filed her rejection of the remittitur, *i.e.,* June 8, 2005.

**Trial Relief. Excessive Damage Award for Noneconomic Loss**

. . .

(c) If the court finds that the damage award for noneconomic loss is excessive, the court shall remit the award. *If the plaintiff declines to accept the award as remitted, the court shall grant a new trial limited to a damage award for noneconomic loss.* The verdict or decision as to liability, economic damages, and punitive damages shall not be set aside under this rule.

Pa.R.C.P. 1042.72 (emphasis added).

¶ 35 The defendants in the instant case argue that this appeal must be quashed because, pursuant to subsection (c), a plaintiff who rejects the remittitur of an award for noneconomic damages must first undergo a new trial with regard to those damages before he or she may appeal the remittitur. In response, plaintiff Vogelsberger argues that Pa.R.A.P. 311(6) provides that an order granting a new trial is an interlocutory order, which is immediately appealable as of right, and that *nothing in Pa.R.C.P. 1042.72(c) prohibits a plaintiff from taking an appeal from an order that grants a new trial following the plaintiff's rejection of remittitur.* In reconciling these rules, we have applied rules of statutory and rule construction to conclude, initially, that Pa.R.C.P. 1042.72 does not prohibit a plaintiff from taking an immediate appeal from an order granting a new trial on noneconomic damages following the plaintiff's rejection of remittitur. Once an order for a new trial is entered under these circumstances, the plaintiff may take an immediate appeal from the order granting a new trial pursuant to Pa.R.A.P. 311(6). Thus, as we shall now explain more fully, we deny the defendants' motions to quash plaintiff Vogelsberger's appeal.

¶ 36 The Pennsylvania Rules of Civil Procedure, promulgated by our Supreme Court, provide for rules of construction. Pa.R.C.P. 51–153. Overall, "[t]he object of all interpretation and construction of rules is to ascertain and effectuate the intention of the Supreme Court." Pa.R.C.P. 127(a). However, the "rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable." Pa.R.C.P. 126. Additionally, Pa.R.C.P. 103 ("Words and Phrases") indicates that "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage. . . ." Pa.R.C.P. 103(a). Moreover, "[e]very rule shall be construed, if possible, to give effect to all its provisions. When the words of a rule are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Pa.R.C.P. 127(b). Also, "[r]ules or parts of rules are in pari materia when they relate to the same proceedings or class of proceedings. Rules in pari materia shall be construed together, if possible, as one rule or one chapter of rules." Pa.R.C.P. 131.

¶ 37 We interpret our Rules of Appellate Procedure with reference to the rules of statutory construction contained in "Chapter 19 of Title 1 of the Pennsylvania Consolidated Statutes. . . ." Pa.R.A.P. 107. *See also* 1 Pa.C.S. §§ 1901–1991. Nevertheless, the rules of statutory construction are similar to those contained in our Rules of Civil Procedure. *See* Pa. R.A.P. 107 note. Thus, the intent of our Supreme Court, who promulgates our appellate rules, controls interpretation of the rules. *See* 1 Pa.C.S. § 1921. Additionally, "when the words of [a rule of appellate procedure] are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Also, similar

to Pa.R.C.P. 131, and pertinent for our purposes herein, is the rule that statutes (or rules of appellate procedure) that are in pari materia shall be construed together. *Id.* at § 1932(b).

■ ¶ 38 With these rules of construction in mind, we conclude that Pa.R.C.P. 1042.72 and Pa.R.A.P. 311(6) are in pari materia because they both relate to orders granting new trials. Accordingly, it is proper that they are construed together. Surely, just like "sections of the criminal code are necessarily interrelated, and should be read and construed as an entirety," *Commonwealth v. Lobiondo*, 501 Pa. 599, 462 A.2d 662, 664 (1983), so too should our rules of court.

¶ 39 But most importantly, the language of both rules is plain and unambiguous, and they present no conflict when applied together. As noted above, the pertinent language of Pa.R.C.P. 1042.72(c) reads: "If the plaintiff declines to accept the award as remitted, the court shall grant a new trial limited to a damage award for noneconomic loss." Pa.R.C.P. 1042.72(c) (emphasis added). This plain language merely indicates that if the plaintiff rejects the remittitur, then the court must grant a new trial limited to a determination of damages for noneconomic loss. The rule is silent with regard to when an appeal is properly taken. However, Pa.R.A.P. 311(6) effectively answers this question by providing that an order granting a new trial is an interlocutory order appealable as of right, and there is nothing in either rule that would prohibit an immediate appeal.

¶ 40 Indeed, if our Supreme Court intended to prohibit the application of Pa. R.A.P. 311(6) in situations such as those presented here under Pa.R.C.P. 1042.72(c), and if it, rather, intended that plaintiffs in medical malpractice cases who reject remittitur of their verdicts on noneconomic damages must first undergo the burden of retrying their cases on those damages, the Court would have so indicated in the text of Pa.R.C.P. 1042.72 and/or Pa.R.A.P. 311(6). It is axiomatic that we will not add words to a statute (or in this case rules) that the promulgating body has omitted, unless such words are necessary for its construction. *In re Hancock*, 719 A.2d 1053, 1055 (Pa.Super.1998). The defendants herein would have us add language to Pa.R.C.P. 1042.72 that would prohibit the taking of an immediate appeal; but, nothing in the plain and unambiguous language of Pa.R.C.P. 1042.72 as it currently exists prohibits the taking of an immediate appeal. Rather, Pa.R.A.P. 311(6) comes into play to allow an immediate appeal from an order granting a new trial following a rejection of remittitur. Accordingly, we hold that Pa.R.C.P. 1042.72 indicates that the trial court must enter an order granting a new trial if the plaintiff rejects remittitur of noneconomic damages, and Pa.R.A.P. 311(6) indicates that this order is immediately appealable as of right.

¶ 41 Additionally, we note that our conclusion is supported by a history of case law wherein this Court has undertaken review of orders that granted or denied new trials following the grant or denial of remittitur. *See, e.g., Doe v. Raezer*, 444 Pa.Super. 334, 664 A.2d 102, 104 (1995) (taking appeal from order of post-trial court that granted new trial or remittitur); *Sprague v. Walter*, 441 Pa.Super. 1, 656 A.2d 890, 925 (1995) (reviewing trial court decision denying new trial and remittitur). For all of the above reasons, we refuse to quash this appeal and now proceed to examine the merits of the issues Vogelsberger presents in her appeal, followed by review of the issues Hospital presents in its cross-appeal.

¶ 42 Vogelsberger presents the following "Statement of Questions Involved" in her brief to this Court:

[1] DID THE TRIAL COURT ERR IN DIRECTING REMITTITUR OF JURY VERDICTS WHERE THOSE VERDICTS WERE SUPPORTED BY THE EVIDENCE AND THE TRIAL COURT FAILED TO CONSIDER, MISUNDERSTOOD, AND MISSTATED THE DAMAGE TESTIMONY?

. . .

[2] DOES AN AGREEMENT BETWEEN PHYSICIAN AND PATIENT FOR A PARTICULAR PROCEDURE, CONFIRMED IN WRITING GIVE RISE TO A CAUSE OF ACTION IN CONTRACT WHERE THE PHYSICIAN FAILS TO PERFORM THE PROCEDURE[?]

. . .

[3] WAS AN EVIDENTIARY DETERMINATION AND THE TRIAL COURT'S STATEMENT OF THE OPERATIVE FACTS OF THE LIABILITY CLAIM AGAINST PHYSICIAN SO ERRONEOUS AS TO SUGGEST BIAS OR AT LEAST UNDERMINE THE REST OF THE TRIAL COURT'S ANALYSIS?

Appellant Vogelsberger's brief at 6.

■ ¶ 43 In her first issue, Vogelsberger challenges the trial court's grant of remittitur with regard to the jury's grant of noneconomic damages against each of the defendants. As noted above, the MCARE Act has specific provisions with regard to remittitur of noneconomic damages awards, and our Supreme Court has promulgated associated rules of civil procedure, specifically Pa.R.C.P. 1042.72. Before we examine how the MCARE Act and Rule 1042.72 have impacted remittitur of noneconomic damage awards in medical malpractice cases, we will set forth the law as it existed prior to the MCARE Act.

¶ 44 Prior to the passage of the MCARE Act and promulgation by our Supreme Court of Rule 1042.72, the following standard applied to remittitur in medical malpractice cases:

> The Court is not warranted in setting aside, reducing, or modifying verdicts for personal injuries unless unfairness, mistake, partiality, prejudice, or corruption is shown, or the damages appear to be grossly exorbitant. The verdict must be clearly and immoderately excessive to justify the granting of a new trial. The amount must not only be greater than that which the court would have awarded, but so excessive as to offend the conscience and judgment of the Court.

*Goldberg ex rel. Goldberg v. Isdaner*, 780 A.2d 654, 662, (Pa.Super.2001) (citation omitted). In other words, "[a] remittitur may only be granted where the trial court determines that the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption and articulates the reason supporting a reduction of the verdict." *Id.* (citing *Haines v. Raven Arms*, 536 Pa. 452, 640 A.2d 367, 369 (1994), *supplemented by* 539 Pa. 401, 652 A.2d 1280 (1995)). *See also Raezer*, 664 A.2d at 105 ("The trial court may grant a request for remittitur only when a verdict that is supported by the evidence suggests that the jury was guided by partiality, prejudice, mistake or corruption."). Traditionally, we have also said, "[i]t is within the discretion of the trial court to grant a new trial because the verdict is excessive. We will not disturb the trial court's refusal to grant a new trial on the grounds that the verdict is excessive unless the court clearly abused that discretion." *Goldberg*, 780 A.2d at 663 (citations omitted).

¶ 45 The defendants in the instant case argue that, under the MCARE Act and Rule 1042.72, the standard enunciated in *Goldberg* has been relaxed with regard to granting remittitur for noneconomic damages awarded in medical malpractice cases. In responding to this argument, it is helpful to note the purposes of the MCARE Act before examining the content of these relatively new provisions.

¶ 46 The purposes underlying the medical professional liability provisions of the MCARE Act are to "ensure a fair legal process and reasonable compensation for persons injured due to medical negligence" and to ensure the "future availability of and access to quality health care." 40 P.S. § 1303.502. In congruence with these purposes, and as we previously mentioned, the General Assembly provided a specific provision for remittitur within the MCARE Act, which we now set forth more fully:

§ 1303.515. Remittitur

(a) General rule.—In any case in which a defendant health care provider challenges a verdict on grounds of excessiveness, the trial court shall, in deciding a motion for remittitur, consider evidence of the impact, if any, upon availability or access to health care in the community if the defendant health care provider is required to satisfy the verdict rendered by the jury.

(b) Factors and evidence.—A trial court denying a motion for remittitur shall specifically set forth the factors and evidence it considered with respect to the impact of the verdict upon availability or access to health care in the community.

(c) Abuse of discretion.—An appellate court reviewing a lower court's denial of remittitur may find an abuse of discretion if evidence of the impact of paying the verdict upon availability and access to health care in the community has not

been adequately considered by the lower court.

40 P.S. § 1303.515(a)-(c). Subsections (b) and (c) are inapplicable in the instant case because the trial court did not deny the motions for remittitur. Nevertheless, it is apparent from the plain language of subsection (a), which appears to be generally applicable to the trial court's decision on whether to grant or deny remittitur, as well as subsections (b) and (c), that, in congruence with the purposes of the MCARE Act, the General Assembly intended that trial courts must consider the impact, if any, upon availability or access to health care in the community, if the defendant provider is required to satisfy a jury verdict. However, the defendants in the instant case have not argued or provided any evidence with regard to any impact on the availability of accessibility of health care if they were made to satisfy the jury's verdict. Their argument in favor of remittitur is premised upon Vogelsberger's lack of trial evidence to support the noneconomic damages award and the jury's improper reliance on irrelevant evidence. *See, e.g.*, Dr. Gentile's Motion for Post–Trial Relief, 2/8/05. Accordingly, section 1303.515 is not really pertinent herein.

¶ 47 However, in its effort to work collaboratively with other branches of government to address concerns over medical malpractice litigation, our Supreme Court adopted Pa.R.C.P. 1042.72, discussed in part above, which is pertinent to the instant case. *See* News Release, Administrative Office of Pennsylvania Courts, Supreme Court Adopts Rules Governing Reduction of Awards (Sept. 20, 2004), *available at* http://www.aopc.org/index/medicalmalpractice/prrel04920.pdf. The subsections of rule 1042.72 pertinent to our discussion of the propriety of remittitur in the instant case are as follows:

(a) In a medical professional liability action in which the trier of fact has made separate findings specifying the amount of noneconomic loss, any defendant may include in a motion for post-trial relief under Rule 227.1 the ground that the damage award for noneconomic loss is excessive.

> *Note:* A damage award for noneconomic loss does not include amounts awarded for medical and other related expenses, loss of earnings or earning capacity, or punitive damages.

(b) A damage award is excessive if it deviates substantially from what could be reasonable compensation. In deciding whether the award deviates substantially from what could be considered reasonable compensation, the court shall consider (1) the evidence supporting the plaintiff's claim; (2) factors that should have been taken into account in making the award; and (3) whether the damage award, when assessed against the evidentiary record, strongly suggests that the trier of fact was influenced by passion or prejudice.

> *Note:* The defendant has the burden of convincing the court that the award deviates substantially from what could be reasonable compensation.
>
> The factors that the trier of fact should take into account are those set forth in the jury instructions described in Rule 223.3.

Pa.R.C.P. 1042.72(a) & (b). Subsection (b) prescribes the standard and considerations the trial court must employ when deciding motions for remittitur of noneconomic damages in medical malpractice cases. Under this rule, a "damage award is excessive if it ***deviates substantially from what could be reasonable compensa-tion.***" Pa.R.C.P. 1042.72(b) (emphasis added).

¶ 48 The "deviates substantially from what could be reasonable compensation" standard differs from the traditional remittitur standard enunciated in *Goldberg* whereby "[t]he verdict must be clearly and immoderately excessive" and "[t]he amount must not only be greater than that which the court would have awarded, but so excessive as to offend the conscience and judgment of the Court" in order to warrant a remittitur. *Goldberg,* 780 A.2d at 662. The "deviates substantially" standard appears to provide more flexibility in the court's discretion to grant remittitur for noneconomic damages in medical malpractice cases than does the traditional "grossly exorbitant" or "shocks the conscience of the court" standard. However, the "deviates substantially from what could be reasonable compensation" standard appears to remain congruent with the traditional common law precept that "remittitur should fix the highest amount any jury could properly award, giving due weight to all the evidence offered." *Cashdollar v. Mercy Hosp. of Pittsburgh,* 406 Pa.Super. 606, 595 A.2d 70, 76 (1991). Nevertheless, it does appear that the new standard enunciated in Rule 1042.72(b) is more flexible insofar that it does not require an award to shock the conscience of the court.[7]

¶ 49 This is not to say that the "deviates substantially from what could be considered reasonable compensation" standard is easy for defendants to meet. As outlined further in subsection (b) of the rule, in deciding whether this standard is met, the court "shall" consider "(1) the evidence supporting the plaintiff's claim; (2) factors that should have been taken

---

7. We emphasize, however, that the new standard enunciated in Pa.R.C.P. 1042.72(b) applies only to remittitur of noneconomic damages in medical malpractice cases. The *Goldberg* standard continues to apply in other cases of remittitur.

into account in making the award; and (3) whether the damage award, when assessed against the evidentiary record, strongly suggests that the trier of fact was influenced by passion or prejudice." We must now determine whether the trial court properly applied these new provisions in granting remittitur of the noneconomic damages award in the instant case. In doing so, we note that the decision to grant or deny a motion for remittitur still remains within the sound discretion of the trial court. *Carrozza v. Greenbaum*, 866 A.2d 369, 382 (Pa.Super.2004). *See also Botek v. Mine Safety Appliance Corp.*, 531 Pa. 160, 611 A.2d 1174, 1176 (1992) (stating that decision to grant new trial due to excessive verdict is within the "peculiar discretion of the trial court, which has observed the demeanor of the witnesses, and its decision will be sustained by an appellate court in the absence of a clear or gross abuse of discretion or error of law which controlled the verdict or the outcome of the case").

¶ 50 The note in subsection (b) of Rule 1042.72 states that "[t]he factors that the trier of fact should take into account [in making an award of noneconomic damages] are those set forth in the jury instructions described in Rule 223.3." Pa. R.C.P. 1042.72(b) note. Rule 223.3 indicates that damages for past and future noneconomic loss consist of four items: "(1) pain and suffering; (2) embarrassment and humiliation; (3) loss of ability to enjoy the pleasures of life; and (4) disfigurement." Pa.R.C.P. 223.3. First, with regard to pain and suffering, the "plaintiff is entitled to be fairly and adequately compensated for all" past and future "physical pain, mental anguish, discomfort, inconvenience, and distress" resulting from her injuries. *Id.* Second, the plaintiff is "entitled to be fairly and adequately compensated for such embarrassment and humiliation" she had endured and will endure in the future as a result of her injuries. *Id.* Third, the plaintiff is "entitled to be fairly and adequately compensated" for the past and future loss of her "ability to enjoy any of the pleasures of life as a result of the injuries[.]" *Id.* Fourth, the plaintiff is "entitled to be fairly and adequately compensated for" past and future suffering for disfigurement from the injury. *Id.* Additionally, the jury instructions provided in Rule 223.3 further indicate:

> In considering plaintiff's claims for damage awards for past and future noneconomic loss, you will consider the following factors: (1) the age of the plaintiff; (2) the severity of the injuries; (3) whether the injuries are temporary or permanent; (4) the extent to which the injuries affect the ability of the plaintiff to perform basic activities of daily living and other activities in which the plaintiff previously engaged; (5) the duration and nature of medical treatment; (6) the duration and extent of the physical pain and mental anguish which the plaintiff has experienced in the past and will experience in the future; (7) the health and physical condition of the plaintiff prior to the injuries; and (8) in case of disfigurement, the nature of the disfigurement and the consequences for the plaintiff.

*Id.* Other factors courts have considered include whether the injury is "manifested by objective physical evidence or whether it is only revealed by the subjective testimony[.]" *Petrasovits v. Kleiner*, 719 A.2d 799, 806 (Pa.Super.1998) (affirming denial of remittitur where plaintiff suffered increased pain following back surgery, could no longer enjoy activities that he enjoyed prior to the surgery, had to take considerable amount of medication that affected his ability to concentrate, became withdrawn from family and friends, and became so severely depressed that he contemplated

suicide). *See also Botek*, 611 A.2d at 1176–77 (concluding remittitur of $50,000 jury verdict was not warranted where plaintiff suffered "objective, measurable, observable physical injuries" such as headaches and nausea, with consequent psychological injuries in the form of post traumatic stress disorder manifested by, *e.g.*, uncontrollable sobbing, for a 7–year period following physical injury, as testified to by plaintiff's psychologist).

¶ 51 Vogelsberger lists evidence in her brief that she contends supported her claims for noneconomic damages. For example, she asserts that she suffered mental anguish from the time period encompassing May 10, 1999, through July 16, 2004, because her ovaries had not been removed and she feared having another surgery, and that she suffered tremendous constipation, physical pain, distress, and inconvenience during this same period of time. *See* Vogelsberger's brief (as appellant) at 18. However, in most instances she does not cite to the place in the record where this evidence can be found. This lack of citation to the record has impeded our review and violates Pa.R.A.P. 2117(a)(4) and 2119. Nevertheless, we have undertaken an examination of the entire trial record in an effort to pinpoint what evidence of noneconomic damages exists. After doing so, we must conclude that the trial court did not abuse its discretion in granting remittitur.

¶ 52 Contrary to the assertions in Vogelsberger's brief, we find a lack of evidence to support noneconomic damages in the intervening 4½ to 5 years between the TAH done by Dr. Gentile and the BSO done by Dr. Deitrick. With regard to Vogelsberger's fear of developing ovarian cancer, there was no evidence with regard to how this fear manifested itself as mental anguish or distress. Vogelsberger admitted that she did not question Dr. Gentile or anyone at his office at any of the three postoperative visits about why her ovaries were not removed. N.T. at 92–94, 130. The only evidence with regard to fear during those years between the TAH and the BSO came from Vogelsberger's best friend, Kelly Albert, who vaguely testified that Vogelsberger conversed with her "several times" about her fear of ovarian cancer. *Id.* at 401–403. Indeed, the trial court concluded that the jury "may have inadvertently reached its excessive award of non-economic damages ... by attaching undue weight to [Vogelsberger's] fear of future disease, without any basis in fact. That injury, and attendant pain and suffering, ... should neither be trivialized or exaggerated by virtue of the parties' advocacy." T.C.O. at 6. The trial court opined that the jury, in granting the excessive verdict, was influenced by passion or prejudice with regard to Vogelsberger's fear of contracting ovarian cancer. *Id.* at 8–9.

¶ 53 Vogelsberger also asserts that she suffered pain, discomfort, risk and inconvenience during this intervening 4½ to 5 year period due to "[n]umerous trips to the gynecologist[,]" and having to obtain ultrasounds and CA–125 testing for detection of ovarian cancer. Vogelsberger's brief (as appellant) at 18. However, the record established that Vogelsberger was noncompliant with obtaining ultrasound tests and cancer screening tests during those intervening years. N.T. at 101–102, 343–44. Moreover, from the last postoperative visit with Dr. Gentile on June 30, 1999, the next time Vogelsberger went to see a gynecologist was in November of 2002, when she returned to Dr. Noorbakhsh with complaints of constipation and abdominal pain later determined to be from adhesions. *Id.* at 101–102, 131–132, 172. Thus, except for the fact that Vogelsberger had a barium enema in late 1999, the record fails to establish that Vogelsberger saw a doctor

for over three years from the date of her last postoperative visit with Dr. Gentile.

¶ 54 Similarly, although Vogelsberger complained of postoperative pain, including pain on the day of her discharge from Hospital, she testified that she was doing "good" by the time of her June 2, 1999 postoperative check-up with Dr. Gentile. *Id.* at 92–93. The next complaints of pain established in the record coincide with her 2002 visit to Dr. Noorbakhsh. Later, on January 20, 2004, Vogelsberger passed out at home from trying to move her bowels. *Id.* at 103. It was at that point that Vogelsberger saw Dr. Noorbakhsh again and arrangements for a BSO and lysis of adhesions were set into motion. After her visit with Dr. Noorbakhsh on May 5, 2004, he reported that she had pelvic pain, but "felt somewhat better." *Id.* at 173–74.

¶ 55 Additionally, Vogelsberger did not claim that her injuries were permanent or that any injury she incurred interfered with her activities of daily living or activities in which she had previously engaged. *See* Pa.R.C.P. 223.3. She presented little evidence of disfigurement, except for the fact that, following her laparoscopy and BSO in 2004, she required outpatient wound repair with a plastic surgeon.

¶ 56 With regard to more specific complaints in the argument portion of her brief, Vogelsberger takes issue with the trial court's conclusion that she had "no memory of the respiratory arrest." T.C.O. at 6. Vogelsberger argues that the trial court improperly disregarded the following testimony, wherein she described the first thing she remembered after being transferred into a regular room:

> ... I remember waking up to ... a tremendous amount of pressure on my face, a lot of pressure on my face, like someone was trying to, like cover my mouth or something. I opened my eyes and all I could see was a bunch of people

around me and this really bright light above my head and it was—it wasn't a light to the tunnel. It was like an operating room light. I couldn't see everybody that was there. I could see silhouettes of everyone and me but I couldn't hear anything. I just remember this thing on my face and I was—I mean, I know what the thing is, but at the time I was just trying to get air. I kind of—like, the best way that I can describe it is like a fish at the bottom of a fish bowl. I tried—it was just I knew there were people there but I didn't know why I had so much pressure on my face. Did they understand that I was trying to get a breath? That's all I wanted to do and I just remember—I remember the first thing that I was able to do was when I got air, I just started screaming help me, help me, help me, and then they were calling my name out and, you know, they just kept calling my name out and you are going to be okay and then they still kept that thing on my face and I remember trying to take it off. They were actually bagging me with a—what they call a bag valve mask—to assist in my ventilations but when I was first coming to, I didn't understand why and I couldn't see anybody because that light was so bright but I just—I couldn't breath and I didn't know where I was. . . .

N.T. at 77–78. However, Vogelsberger fails to mention that, on cross-examination, she admitted that she did not remember anything from the twelve-minute period of respiratory depression. *Id.* at 115. Thus, contrary to Vogelsberger's argument in her brief, the trial court did not misapprehend the record when it stated that she had no memory of the period of respiratory depression itself. Rather, the above-noted testimony described what she recalled in the moments following resuscita-

tion. Additionally, with regard to the fear of undergoing another surgical procedure due to the episode of respiratory depression, Vogelsberger merely agreed that she was "concerned going into the second surgery." *Id.* at 113. The record contains no evidence that Vogelsberger expressed to Dr. Noorbakhsh or Dr. Deitrick that she had a fear of anesthesia or post-operative pain treatment due to the episode of respiratory depression following her TAH in 1999.

¶ 57 Vogelsberger also criticizes the trial court's conclusion that the non-narcotic pain relievers prescribed postoperatively following her respiratory depression were less effective. *See* T.C.O. at 6. Vogelsberger argues that the court disregarded the testimony of her nursing expert at trial, Mary Jane Smith, R.N., Ph.D., who stated that Vogelsberger had "intermittent very poor pain control" and that "there were significant periods of time when her pain was not controlled with the drugs that they were able to give her then." N.T. at 240. Additionally, Vogelsberger testified that her pain while in the ICU was like a hot, burning sensation and that it was not well-controlled with the non-narcotic pain relievers. *Id.* at 79–80. Thus, we agree with Vogelsberger that the trial court misapprehended the record by stating that there was no evidence that the non-narcotic medications were less effective. Nevertheless, despite the trial court's misapprehension of the record on this point, and despite Vogelsberger's argument to the contrary, there remains little evidence with regard to pain, distress, or discomfort beyond the immediate postoperative period in 1999 until the time she reported pelvic pain, from adhesions that had developed, to Dr. Noorbakhsh in 2002. In other words, the court's misapprehension of the record on this single point is not enough for us to conclude that it abused its discre-

tion by granting Hospital's motion for remittitur.

¶ 58 Finally, we are not persuaded by Vogelsberger's and PaTLA's arguments that the trial court ignored evidence that the failure to perform the BSO later resulted in painful adhesions that formed to the ovaries, that Vogelsberger underwent an additional surgery to lyse the adhesions and remove her ovaries, or that the respiratory depression was a traumatic experience. Although these were proper considerations for noneconomic damages, based on our review of the damage evidence contained in the entirety of the record, as detailed above, we cannot conclude that the trial court abused its discretion by determining that the remitted amount was the maximum amount considered reasonable in light of the evidence Vogelsberger presented or that it abused its discretion by determining that the jury may have considered improper factors. In sum, the trial court's decision to grant remittitur, on the basis that $600,000 in noneconomic damages deviated substantially from what could be considered reasonable compensation, did not constitute an abuse of discretion.

■ ¶ 59 In her second issue, Vogelsberger argues that the trial court erred by granting Dr. Gentile's motion for summary judgment on her breach of contract claim against Dr. Gentile. She argues that the language in both Dr. Gentile's April 28, 1999 preoperative office note and the informed consent form, which both she and Dr. Gentile signed, constitute two writings supporting her claim that he contractually agreed to perform the BSO. *See* Vogelsberger's brief (as appellant) at 36.

¶ 60 We first note:

Summary judgment properly is granted after the close of the relevant pleadings "whenever there is no genuine issue of any material fact as to a necessary

element of the cause of action or defense which could be established by additional discovery or expert report" and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). The standard of our review of an order granting or denying a motion for summary judgment pursuant to Rule 1035.2 is well established. In reviewing an order granting summary judgment, an appellate court must examine the record in the light most favorable to the non-moving party. We will reverse only if there has been an error of law or a clear abuse of discretion.

*Grossman v. Barke*, 868 A.2d 561, 566 (Pa.Super.2005) (case citation omitted). Additionally, "[o]ur scope of review is plenary with regard to questions of law[,]" but, "we are not bound by the trial court's conclusions of law and, instead, we may reach our own inferences and conclusions." *Id.* (citations omitted).

¶ 61 In explaining its reasons for granting summary judgment on the breach of contract claim, the trial court stated: "Pennsylvania law is clear that in the absence of a battery claim, which [Vogelsberger] did not plead, a breach of contract action against a physician for failure to perform a service will not lie where the factual averments essentially sound in professional negligence." T.C.O. at 9 (citing *Grabowski v. Quigley*, 454 Pa.Super. 27, 684 A.2d 610 (1996)). Based on our reading of *Grabowski*, it appears that the trial court misconstrued *Grabowski* and, consequently, made an error of law. We believe that the trial court confused the lack of informed consent claim in *Grabowski* with the breach of contract claim, as we now explain.

¶ 62 In *Grabowski*, the plaintiff brought a breach of contract claim against his surgeon, Dr. Quigley, claiming that he had consented only to Dr. Quigley performing his back surgery, but that another surgeon, unbeknownst to the plaintiff until after the surgery, actually performed it. *Grabowski*, 684 A.2d at 613. The trial court granted summary judgment on the breach of contract claim, as well as the other claims the plaintiff brought, *i.e.*, lack of consent and negligence. *Id.* However, the plaintiff had alleged facts "which demonstrate[d] that he consented to an operation to be performed in its entirety by Quigley" and not by the other surgeon. *Id.* at 614. Although Dr. Quigley asserted that the informed consent form read that the surgery would be "performed under the direction of Dr. Quigley, et al[,]" the plaintiff testified that the "et al" looked to him like "ETOL," and he did not understand what this meant until his lawyer later explained it to him. *Id.* Thus, the plaintiff argued that the informed consent form was ambiguous on its face. *Id.* at 616. Moreover, the plaintiff pointed to documentary evidence that, on the morning of his surgery, Dr. Quigley was paged multiple times and was eventually found in a neighboring county. *Id.* at 614. The plaintiff also presented a letter written by Dr. Quigley to his superior in which Dr. Quigley acknowledged that he was to operate on the plaintiff that morning, but then discovered, to his " 'chagrin, when [approximately one hour after anesthesia had been introduced] [he] received a phone call that [his] first case was on the table already asleep.' " *Id.* He explained in the letter that he decided to allow the other surgeon to begin the surgery since the plaintiff was already under anesthesia. *Id.* Our Court reversed the grant of summary judgment on the lack of consent claim after determining that, based on the above evidence, there was a genuine issue of fact with regard to whether the plaintiff gave his consent only to Dr. Quigley. *Id.* at 614, 616.

¶ 63 Although the lack of consent claim in *Grabowski* was premised on a battery theory, the breach of contract claim was not. The *Grabowski* court stated that the plaintiff presented a breach of contract claim that arose out of the alleged agreement between the plaintiff and Dr. Quigley for performance of the surgery by Dr. Quigley. *Id.* at 616. The Court stated that the same *facts* underlying the lack of informed consent claim supported the plaintiff's claim that Dr. Quigley breached a contract to perform the surgery himself. The Court did *not* state that a cause of action in battery was necessary to sustain a breach of contract claim premised on the alleged promise of a physician to perform a surgery himself. The battery analysis was made in conjunction with the lack of informed consent claim, and was not related to the breach of contract claim. Thus, the trial court in the instant case committed an error of law by concluding that Vogelsberger's failure to plead battery precluded her from bringing a breach of contract claim against Dr. Gentile.

¶ 64 Furthermore, with regard to the breach of contract claim in *Grabowski*, we noted that the legal relationship between the physician and the patient is contractual in nature and, thus, for example, "if a patient consults a surgeon for the purpose of removing a tumor from his arm, a contract is entered into which requires the surgeon to remove the tumor. Therefore, he must not digress from that contract and also remove the patient's appendix." *Id.* (quoting *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663, 669 (1966)). *See also Zehr v. Haugen*, 318 Or. 647, 871 P.2d 1006, 1010 (1994) (concluding that plaintiff stated claim for breach of contract by alleging that physician agreed to perform tubal ligation but failed to do so, and stating that, "where the parties have agreed upon the performance expected by the plaintiff and promised by the defendant in terms

that commit the defendant to that performance without reference to, and irrespective of, any general standard of care, the defendant may be liable on the contract whether or not he or she was negligent").

¶ 65 Like Dr. Gentile in the instant case, the defendants in *Grabowski* argued that the plaintiff's breach of contract claim must fail in the absence of a "special or expressed contract" between physician and patient to perform the procedure at issue. *See id.* at 616. This argument is based on the following statutory provision now contained in the MCARE Act:

### § 1303.105. Provider not a warrantor or guarantor

In the absence of a special contract in writing, a health care provider is neither a warrantor nor a guarantor of a cure.

40 P.S. § 1303.105. The defendants in *Grabowski* argued that this provision (previously codified at 40 P.S. § 1301.606) precluded the plaintiff's breach of contract claim. The *Grabowski* court recognized "various decisions holding that a breach of contract claim would not lie, absent such a [special] contract, where the plaintiff sought to obtain a specific result from the treatment." *Grabowski*, 684 A.2d at 616. However, the *Grabowski* court concluded that these cases did not apply because the plaintiff was not alleging a warranty theory or the failure to "obtain a specific result from the treatment." *Id.* Rather, the Court indicated that the plaintiff "has alleged only that he and Quigley entered into an oral contract whereby Quigley would perform the surgery." *Id.*

¶ 66 Similarly, we conclude that section 1303.105 is inapplicable to Vogelsberger's breach of contract claim, which was not predicated on the guarantee of a cure but, rather, on the averment that Dr. Gentile agreed to perform a specified procedure,

*i.e.*, the prophylactic BSO, but failed to do so. *See* Vogelsberger's brief (as appellant) at 36. Vogelsberger was not seeking a "cure," which, according to its plain meaning, is defined as "recovery or relief from a disease." Merriam–Webster Online Dictionary, *available at* http://www.m-w.com/dictionary/cure (accessed May 20, 2006). Vogelsberger's ovaries were not diseased at the time of her surgery with Dr. Gentile—rather, she presented evidence that she sought *prophylactic* treatment in the form of a BSO.

¶ 67 We recognize that the language of what is now section 1303.105 "was designed to address the realities of medical practice ... [in that] [t]here are so many variables in medical treatment of an individual that it is almost impossible for a medical doctor to predict the precise result of a medical procedure or course of treatment." *Flora v. Moses*, 727 A.2d 596, 599 (Pa.Super.1999). In *Flora*, we found that this statute applied to preclude a breach of contract claim, absent a special contract in writing, under circumstances whereby medical treatment for bilateral gangrene of the plaintiff's extremities, caused by peripheral vascular disease attributable to diabetes, was ineffective to prevent, ultimately, amputation of both of the plaintiff's legs. The circumstances herein are distinguishable from those in *Flora* in that Vogelsberger was not seeking a cure for a disease and was disappointed that the treatment did not effectuate such cure but, rather, where she sought a specific prophylactic procedure in the absence of disease, to provide her assurance that she would not develop the disease in the first place. Accordingly, section 1303.105 is inapplicable to the circumstances before us.

¶ 68 Rather, like *Grabowski*, "[t]he evidence of record indicates that a question exists as to whether a contract was created by the dealings between [Vogelsberger] and [Dr. Gentile]." *See Grabowski*, 684 A.2d at 617. *See also Viola v. Bocher*, 740 A.2d 1176, 1178 (Pa.Super.1999) ("The intent to contract is a question of fact for the trier of fact."). This evidence includes Vogelsberger's testimony that, at her initial appointment and discussion with Dr. Gentile on April 28, 1999, "it was definitely a mutual agreement" that he would perform the TAH and a prophylactic BSO, due to her family history of ovarian cancer and her expressed fear of developing ovarian cancer. N.T. at 68. Indeed, Dr. Gentile's office note of April 28th indicated "definitive" treatment in the form of a TAH and BSO. Although Dr. Gentile testified that definitive treatment pertained only to the TAH, given that Vogelsberger had a confirmed diagnosis of a fibroid uterus, Vogelsberger's expert, Dr. Burkons, testified as to his contrary interpretation of the note. Dr. Burkons testified that the note, in conjunction with the April 28th informed consent form authorizing Dr. Gentile to perform "TAH/BSO," constituted evidence that Dr. Gentile had agreed to perform a prophylactic BSO. Vogelsberger posits that Dr. Gentile, who had no independent recollection of this case outside of the medical record, "forgot" to perform the prophylactic BSO between the time of her April 28th office appointment and the date of her surgery on May 7th, when he documented that he would perform a TAH and "possible" BSO.

¶ 69 We recognize that Dr. Gentile testified that he could recall only one case of prophylactic BSO (not Vogelsberger's) in his 32–year career, indicating that typically, a BSO will not be performed (especially in a premenopausal patient) unless he, for example, observes diseased ovaries while performing the surgery, intraoperatively, which may explain his operative note of TAH and *"possible* BSO." Nevertheless, this is proper evidence for the jury to consider when determining whether a con-

tract for prophylactic BSO in the case of undiseased ovaries did indeed exist. In deciding this question, the jury would also have before it (in addition to Vogelsberger's recollection of contract formation and the documentation[8] from April 28th) the testimony of Vogelsberger's expert, Dr. Burkons, who supported the proposition that Vogelsberger's request for prophylactic BSO was a rational and valid request that should have been honored. In all, based on the record viewed in the light most favorable to Vogelsberger, we conclude that there exists a genuine issue of material fact with regard to whether there existed an enforceable contract to perform a prophylactic BSO between Vogelsberger and Dr. Gentile and, therefore, the trial court committed an abuse of discretion by dismissing the breach of contract claim against Dr. Gentile on summary judgment. Thus, we remand for a new trial on the breach of contract claim.[9]

■ ¶ 70 In her final issue, Vogelsberger argues that the trial court demonstrated bias by misconstruing the facts, and that the trial court erred by permitting Dr.

Gentile, who had no independent recollection of this case, to testify about what he meant by the word "definitive" in his April 28th office note. However, Vogelsberger cites no case law or other authority in support of these arguments. Accordingly, these issues are waived. *See Lackner v. Glosser*, 892 A.2d 21, 29–30 (Pa.Super.2006) (citing Pa.R.A.P. 2119 for rule that failure to cite pertinent authority results in waiver).

■ ¶ 71 Finally, Hospital filed a notice of appeal from the May 24, 2005 order denying its post trial motions for JNOV and/or new trial.[10] Hospital's underlying argument is that, although Vogelsberger presented expert testimony that the nursing staff breached the applicable standard of care by, for example, failing to properly monitor Vogelsberger's postoperative level of sedation, Vogelsberger failed to establish that her injuries were caused by the breach.

■ ¶ 72 When evaluating whether a plaintiff failed to present a *prima facie*[11]

---

8. We are not suggesting that the office note and the informed consent form constituted a written contract but, rather, may be considered evidence of what the parties agreed to at the office visit.

9. We note that a new trial on the breach of contract claim may be held in conjunction with the new trial on noneconomic damages.

10. We recognize that generally "an order refusing a new trial or judgment n.o.v. is not appealable until it has been reduced to judgment and docketed." *Anskis v. Fischer*, 294 Pa.Super. 212, 439 A.2d 826, 826–27 (1982). However, we are faced with unique circumstances herein whereby no final judgment could be entered at this point, as we are affirming the remittitur and, consequently, the grant of a new trial. Upon remand, the new trial will be held on noneconomic damages and the breach of contract claim against Dr. Gentile that was improperly dismissed on summary judgment. The new trial would not

encompass relitigation of Hospital's liability issues, unless we were to conclude in Hospital's favor on its cross appeal that the trial court erred by denying Hospital's motion for new trial on the issue of causation. In other words, in the interest of judicial economy, we should review Hospital's appeal because if we find in their favor, a new trial on causation could be held together with the new trial on the other issues on remand. The fact that we ultimately do not find in the Hospital's favor in its cross appeal does not change the fact that review at this point is proper and serves the purpose of judicial economy.

11. A *prima facie* case of medical malpractice consists of proving that (1) the medical practitioner owed a duty to the plaintiff; (2) the practitioner breached that duty; (3) the breach was the proximate cause of, or substantial factor in, bringing about the harm suffered by the plaintiff; and, (4) the damages suffered were a direct result of that harm.

case of medical malpractice, we recognize that the verdict winner:

> is entitled to have her evidence viewed on appeal in the light most favorable to her; she must be given the benefit of every fact and every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in her favor.

*Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888, 891 (1990) (citation omitted). We will not disturb the jury's findings "absent a showing that the verdict is capricious, against the weight of the evidence and resulted in a miscarriage of justice." *Id.* (citation omitted).

¶ 73 In *Mitzelfelt,* our Supreme Court revisited the principle it had enunciated in *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978), namely:

> [o]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Mitzelfelt,* 584 A.2d at 892 (quoting *Hamil,* 392 A.2d at 1286). Additionally,

> [i]n establishing a *prima facie* case, the plaintiff need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to plaintiff.

*Id.* (quoting *Hamil,* 392 A.2d at 1285). The question in *Mitzelfelt,* which is also presented under the facts of the instant case, is whether the plaintiff "introduced

evidence that the acts of the [defendants] *increased the risk of harm* to the [plaintiff]." *Id.* Moreover, the plaintiff's expert need not use the magic words or phrases such as, "increased the risk of harm;" rather, we examine the testimony as a whole, and the substance of the testimony, to determine if it meets this standard. *Id.* at 894.

█ ¶ 74 In conducting this analysis, we perform a two-step test. First, we ask whether the plaintiff's expert "could testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the [plaintiff] suffered." *Id.* "The second step is to determine whether the acts complained of caused the actual harm suffered by appellant." *Id.* However, this standard is relaxed in cases such as the instant case, where it is impossible to state with a reasonable degree of medical certainty that the negligence actually caused the injury. *Id.* Rather, if the expert can opine to a reasonable degree of certainty that the acts or omissions *could have* caused the harm, then it becomes a question for the jury with regard to whether they believe it caused the harm. *Id.* In other words:

> Once there is sufficient testimony to establish that (1) the [health care provider] failed to exercise reasonable care, that (2) such failure increased the risk of physical harm to the plaintiff, and (3) such harm did in fact occur, then it is a question properly left to the jury to decide whether the acts or omissions were the proximate cause of the injury. The jury, not the medical expert, then has the duty to balance probabilities and decide whether defendant's negligence

*Carrozza v. Greenbaum,* 866 A.2d 369, 379 (Pa.Super.2004). Expert testimony is required where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson, as in the instant case. *Id.*

was a substantial factor in bringing about the harm.

*Id.* at 894–95 (citations and quotation marks omitted). *See also Billman v. Saylor,* 761 A.2d 1208, 1212 (Pa.Super.2000) (indicating that question of whether negligent conduct increased risk of harm to plaintiff is ultimately for the jury where, although plaintiff is unable to show that acts/omissions caused harm, he is able to show to a reasonable degree of medical certainty that act/omissions increased the risk of harm); *Carrozza,* 866 A.2d at 380–81 (stating that "in cases where the plaintiff has introduced sufficient evidence that the defendant's conduct increased the risk of injury, the defendant will not avoid liability merely because the plaintiff's medical expert was unable to testify with certainty that the defendant's conduct *caused* the actual harm[,]" and "[t]he trial court may send the issue of causation to the jury 'upon a less than normal threshold of proof' as long as reasonable minds could conclude that a preponderance of the evidence shows the defendant's conduct was a substantial factor in causing the resulting harm[,]" which determination rests with the jury).

¶ 75 As in *Mitzelfelt,* we conclude that Vogelsberger presented sufficient facts from which the jury could conclude that Hospital's deviations from the standard of care increased the risk of harm, *i.e.,* from respiratory depression, to Vogelsberger, thereby providing a basis upon which the question of causation was properly submitted to the jury. Specifically, Vogelsberger's nurse expert, Mary Jane Smith, R.N., Ph.D., recounted the detailed history of postoperative medication administration, including loading doses of morphine administered by the recovery room nurse and floor nurses and the assessments these nurses performed to evaluate pain and sedation. N.T. at 187–205, 216–219. She opined that the nurses failed to properly monitor Vogelsberger's pain level, sedation level, respiratory rate, and oxygen saturation. *Id.* at 184, 203, 205. Nurse Smith also opined that the nursing care was not properly coordinated, documentation and charting was incomplete or misleading, and nurses failed to properly monitor Vogelsberger for any additional effects of the anti-nausea medication. *Id.* at 184–185, 206–207. For example, Nurse Smith cast doubt on the testimony of the nurse who stated that she assessed Vogelsberger's respiratory rate at 11:40 a.m., but who charted only that Vogelsberger was sleeping with her sister at her side, and Nurse Smith concluded that the nurse did not properly assess Vogelsberger's pain level. *Id.* at 208, 212–13. Nurse Smith stated that the nurses should not have been satisfied that Vogelsberger merely appeared to be sleeping, but, rather should have attempted to arouse her "or assess her pain or sedation level." *Id.* at 214.

¶ 76 Nurse Smith also testified it was a breach of the standard of care for nurses to instruct Vogelsberger's husband and sister that they could press the PCA button on her behalf. *Id.* at 228. The reason for this is, if the patient cannot press the button herself, she is too sedated, thereby undermining the principle that the PCA pump "is for the patient to control the amount of medication they need and when they need it, not for someone else to do it." *Id.* at 228–30. Nurse Smith opined that it seemed "inconsistent that someone could be sleeping for a period of time and also be pushing the trigger button on a pain medication every six minutes." *Id.* at 231. She also stated that if Vogelsberger was using the PCA that frequently, the nurses should have been aware of that level of usage and should have been aware of the fact that sequential doses of morphine have an "additive" or "accumulation" effect, thereby intensifying the action of the drug. *Id.* at 232. Importantly, Nurse Smith explained

that the respiratory depression that occurred in this case constituted an "adverse" or "unexpected event" from the administration of morphine. *Id.* at 238.

¶ 77 Based on this testimony, we conclude that Vogelsberger presented sufficient evidence whereby the jury could conclude that the nurses' failure to monitor Vogelsberger increased her risk of suffering a respiratory depression. Accordingly, we find no merit to the issues Hospital presents in its cross appeal.

¶ 78 For the foregoing reasons, we affirm the grant of a new trial following remittitur of the jury's verdict with regard to both defendants; we reverse the trial court's grant of summary judgment which dismissed Vogelsberger's breach of contract claim against Dr. Gentile; and we affirm the trial court's denial of relief to Hospital based on its complaint that Vogelsberger failed to present sufficient evidence of causation.

¶ 79 Order dated May 24, 2005 affirmed. Order granting summary judgment to Dr. Gentile on breach of contract claim reversed. Case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.